UNITED STATES, Appellee

v.

HARVEY GEORGE BARTHOLOMEW, Private First Class,
U. S. Army, Appellant

1 USCMA 307, 3 CMR 41

No. 166

Decided April 16, 1952

LT. COL. James C. Hamilton, U. S. Army, for Appellant.

LT. COL. Thayer Chapman, U. S. Army, and 1ST. LT. Bernard A. Feuerstein, U. S. Army, for Appellee.

PAUL W. BROSMAN, Judge:

Petitioner was charged with premeditated murder and assault with intent to commit rape, violations ·of Articles of War 92 and 93, respectively, 10 U.S.C. §§ 1564, 1565. Both offenses were alleged to have occurred in Korea on March 27, 1951. The accused was tried by general court-martial held on May 15, 16, and 17, 1951, was convicted of voluntary manslaughter and assault with intent to commit rape, and was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for 25 years. The convening authority approved and a board of review in the Office of The Judge Advocate General, United States Army, affirmed. We granted the accused's timely petition for review directed to the following issues:

1. Whether the respective qualifications of the trial judge advocate and defense counsel were in accordance with the requirements of Article of War 11.

2. Whether the board of review erred in affirming the finding of voluntary manslaughter.

3. Whether the introduction of, and ·repeated reference to, photographic exhibits were to the substantial prejudice of the accused.

4. Whether the board of review erred in approving the action of the law member in sustaining the trial judge advocate's objection to a question regarding cause of death.

As most important, we treat at the threshold the question of whether the trial of this case was characterized by a prejudicial disparity in the qualifications of counsel. A stipulation entered into by and between appellate defense and Government counsel discloses that the trial judge advocate, while not a member of The Judge Advocate General's Corps, nor of any bar, held a Bachelor of Arts degree from the University of Pittsburgh, was graduated from the Duquesne University School of Law in 1933, and had enjoyed extensive legal experience in the Army. Defense counsel, on the other hand, was a high school graduate with no professional education and relatively little legal experience. In short, the prosecuting officer was in most senses of the term a lawyer; defense counsel was not. It is urged that this disparity in legal qualifications is ground for reversal. It should be noted that neither the assistant trial judge advocate nor the assistant defense counsel in this case was legally trained.

The trial of the case at bar was held under the older dispensation based on the Articles of War and the Manual for Courts-Martial, U. S. Army, 1949. Article of War 11, 10 USC § 1482, here applicable, provides in pertinent part as follows:

"For each general or special court-martial the authority appointing the court shall appoint a trial judge advocate and a defense counsel, . . . Provided, That the trial judge advocate and defense counsel of each general court-martial shall, if available, be members of the Judge Advocate General's Corps or officers who are members of the bar of a Federal court or of the highest court of a State of the United States: Provided further, That in all cases in which the officer appointed as trial judge advocate shall be a member of the Judge Advocate General's Corps, or an officer who is a member of the bar of a Federal court or of the highest court of a State, the officer appointed as defense counsel shall likewise be a member of the Judge Advocate General's Corps or an officer who is a member of the bar of a Federal court or of the highest court of a State of the United States: . . ."

The Article specifically commands that, if the trial judge advocate be a member of The Judge Advocate General's Corps, or of one of the mentioned bars, then defense counsel must be similarly qualified. However—contrary to the corresponding provision of the Uniform Code of Military Justice—Article of War 11, supra, does permit both

**309**

counsel to be non-lawyers. We have before us a case midway between these two extremes. Appellate defense counsel urges that, although there is here no express violation of the terms of the quoted Article, the stipulated disparity amounts to a major violation of its spirit; that this spirit, rather than the letter of the legislation, should guide us; and that reversal is required. We think there is considerable merit to this contention. In order to resolve the question, we shall assume that the stipulation dealing with comparative qualifications of counsel is properly before us as a part of the record. It is to be observed that the present matter was not raised either at the trial or when the case was before the board of review.

The Manual for Courts-Martial, U. S. Army, 1949, paragraph 43a, uses the following language in this connection:

"In any case in which the appointed trial judge advocate is a member of the Judge Advocate General's Corps or of the bar of a Federal court or the highest court of a State of the United States, the appointed defense counsel must be an officer who is similarly qualified. Although the trial judge advocate may be an officer of the Judge Advocate General's Corps, the defense counsel need not be an officer of such Corps, provided he is a member of the bar of a Federal court or the highest court of a State of the United States. . . .

"It is a purpose of Article 11 to insure that an accused person shall have the right, subject to express waiver, to be represented at his trial by general or special court-martial by a legally qualified lawyer in every case in which the prosecution is conducted by an officer so qualified. Necessary action will be taken at all stages of the proceedings to provide such representation. . . ."

See also Manual for Courts-Martial, supra, paragraph 6.

The legislative history of the Act of June 24, 1948 (Public Law 759, 80th Cong.), amending the Articles of War, which Act substantially altered pre-existing court-martial procedure, sheds,

310

more than a little light on the thinking and motives behind the adoption of Article of War 11. We would be deaf indeed if we did not recognize that a major fault found with military practice during the recent war was the allegedly recurrent failure to provide accused persons with legally-trained counsel. Indeed, the custom—attested by some witnesses—of using lawyers more often as prosecution than as defense counsel has been characterized as particularly reprehensible. However, in the 1948 Amendments Congress recognized that service exigencies made difficult the assignment of legally-trained counsel to all general courts-martial. As a compromise, apparently, it was provided that where the trial judge advocate was legally qualified, so also should the defense counsel be qualified. The intent here could not have been to prohibit non-lawyers from serving as counsel; it must have been to equalize qualifications of counsel on both sides. This is made abundantly clear in testimony concerning Article of War 11, supra, before the House Committee on Armed Services by Kenneth C. Royall, Esq., then Under Secretary of War. His comment on this subject is contained in H.R. 2575, 80th Cong., First Session, page 1919:

"Whenever practicable, defense counsel in general court cases must be attorneys, and it is contemplated that will be true in most cases. But whether it is practical or not, the defense counsel, in both special and general courts-martial must always be an attorney in case the prosecuting judge advocate is an attorney, *so that the defendant may have qualified legal counsel comparable to the prosecuting counsel.*" (Italics supplied)

We have no hesitancy in concluding that the disparity in legal qualifications of counsel disclosed in the case now before us is inconsistent with the spirit, although not the letter, of the Articles of War. The right to counsel is an essential element in the American conception of a fair trial. While only indirectly involved here, the fundamental importance of this right demands that we exercise care to avoid undermining the protection afforded by Congress through reliance on what might well be

regarded as technicality. To say that the Articles of War were not violated where the defense counsel was not a lawyer, but the prosecutor was so in substance, on the ground that the latter was not specifically "qualified" as required by Article 11, is—it may be argued with force—to elevate form over substance.

A clear violation of the express terms of Article of War 11 would certainly raise serious questions of military due process, if not of jurisdiction. Cf. United States v. Clay (No. 49) 1 USCMA 74, 1 CMR 74 decided November 27, 1951; United States v. Berry (No. 69) 1 USCMA 235, 2 CMR 141 decided March 18, 1952; United States v. Bound (No. 201) 1 USCMA 224, 2 CMR 130 decided March 13, 1952; United States v. Lee (No. 200) 1 USCMA 212, 2 CMR 118 decided March 13, 1952. We have, however, been reminded that "courts sit as well to convict the guilty as to acquit the innocent, and complaint alone, without a showing that a fair trial has been denied, will not support a reversal." Couchois v. United States, 142 F2d 1, 2 (CA5th Cir). Congress has implicitly recognized, through the Article of War so frequently cited herein, that an accused person may obtain adequate representation by a non-lawyer. Indeed, line officers have long been permitted to defend such persons before military courts-martial. This background is persuasive that prejudice cannot be inferred solely from the fact that the prosecutor was legally trained, whereas defense counsel was not. In view of these factors, and recalling that we find here at least a literal and technical compliance with the command of Congress, it is appropriate that we should scan the record to determine whether the accused's want of legally-trained counsel materially prejudiced him in this case. We note, incidentally, the existence of a persuasive and well-established practice suggesting such a course in the decisions of the Supreme Court of the United States dealing with the right to counsel. See Powell v. Alabama, 287 US 45, 77 L ed 158, 53 S Ct 55, 84 ALR 527; Avery v. Alabama, 308 US 444, 84 L ed 377, 60 S Ct 321; Uveges v. Pennsylvania, 335 US 437, 93 L ed 127, 69 S Ct 184; Gibbs v. Burke, 337 US 774, 93 L ed 1686, 69 S Ct 1247; Botts v. Brady, 316 US 455, 86 L ed 455, 62 S Ct 1252.

The record discloses that petitioner's counsel provided highly effective representation throughout the proceedings. A thorough pre-trial investigation was held, during which the accused was represented by counsel. At the court-martial hearing defense counsel engaged in vigorous cross-examination of prosecution witnesses. He displayed a more than adequate understanding of the rules of evidence by objecting frequently and soundly to improper questions and responses. Since both the homicide and the assault were observed by other soldiers who testified for the prosecution, the scope of defense logically and practically possible was extremely limited. Through cross-examination, however, defense counsel did develop and emphasize as fully as possible the fact that the accused had been drinking prior to the offenses. Several witnesses were called to testify concerning petitioner's good character and reputation. Although a verbatim account of either closing argument does not appear in the record, it is affirmatively stated therein that defense counsel did in fact present oral argument. Finally—and in terms of the proof of the pudding—a substantial inference as to the quality of the defense may be drawn from the fact that, although petitioner was charged with and the prosecution offered evidence concerning a deliberate and revolting murder of a fellow soldier, petitioner was convicted of voluntary manslaughter only. After a painstaking search of the entire record, we find nothing whatever which would indicate that the accused was not accorded full, fair, and competent representation by his counsel. This being the case, we cannot at all say that he was materially prejudiced in any substantial right.

Because there was in this case a literal adherence to the standard set by Congress in Article of War 11, as well as for readily discernible reasons of a practical character, we do not regard the present one as a proper instance for the invocation of the concept of general prejudice as developed in United States

**311**

v. Lee, supra, and applied in United States v. Berry, supra. See also United States v. Bound, supra.

We are not unmindful of the fact that, with the gradual disappearance from our docket of cases decided under the older system of military justice based on the Articles of War and the 1949 Manual for Courts-Martial, the present problem is one not likely to arise often hereafter in general court-martial cases. However, the problem is in no sense an academic one, and it has been accorded the detailed attention it has received herein because of the possibility of its recurrence under the Uniform Code and the 1951 Manual in cases tried by special court-martial. See Uniform Code of Military Justice, Article 27 (c), 50 USC § 591; Manual for Courts-Martial, United States, 1951, paragraphs 6c and 61f. For this reason we have been anxious to express at some length the views of this Court in the area under consideration.

The second issue concerns the propriety of findings of guilty of voluntary manslaughter in a case in █ which the accused was charged with premeditated murder. Appellate defense counsel contends that an essential element of the crime of voluntary manslaughter is "heat of sudden passion brought about by adequate provocation;" that the record contains no evidence of this ingredient; and that the findings of guilty of voluntary manslaughter cannot therefore, stand. Conceding error arguendo, we think counsel is in no position to complain, since petitioner was found guilty of the lesser offense, whereas in our opinion the evidence clearly supports a greater.

The crime of felonious homicide was a generic offense at common law. Odgers, The Common Law of England, page 257. As such, it necessarily included both murder and manslaughter. The generic nature of the offense is recognized in virtually all jurisdictions of the United States. The Manual for Courts-Martial, U. S. Army, 1949, paragraph 180a, states that "manslaughter is unlawful homicide without malice aforethought and is either voluntary or

**312**

involuntary." It is also stated that both voluntary and involuntary manslaughter are lesser offenses included within a charge of murder. Manual for Courts-Martial, U. S. Army, 1949, paragraph 179a. Certainly petitioner cannot complain, therefore, that the offense of voluntary manslaughter was not included within the crime charged.

The element distinguishing murder from manslaughter is the presence within the former of malice aforethought. Unlawful homicide characterized by this quality is murder. Without malice aforethought, and if the killing is done intentionally or through culpable negligence, the crime is manslaughter, either voluntary or involuntary. In all cases of voluntary manslaughter there is an actual intention to kill or such an intent to inflict great bodily harm—or on the basis of distinctly limited authorities such uncontrolled recklessness—as to imply such an intent. In the language of Clark and Marshall, A Treatise on the Law of Crimes, 4th ed., 1940, page 311:

"It is manslaughter, and not murder, because there is no malice aforethought, not because of any absence or presence of intention to kill."

It is agreed that heat of passion or mutual combat will ordinarily reduce murder to manslaughter because the law has been able to recognize an absence of malice through such heat of feeling induced by adequate provocation, or through mutual combat based on sudden quarrel. To put it in another way, the law has been able in such a situation to interpret homicidal conduct in terms other than those of malice aforethought. The following phrasing is used in Miller, Handbook of Criminal Law, pages 279–280:

"In order to determine whether malice was present or not, in any particular homicide, and thus to distinguish between murder and voluntary manslaughter, *it is customary to use the test* of whether the killing was done in mutual combat upon a sudden quarrel, or whether the accused was subjected to such provocation by the deceased as to cause sudden hot blood or passion, as a result of which his

reason was so disturbed or obscured that he acted rashly, without deliberation or reflection and from passion rather than judgment." (Italics supplied)

Whether a court may—in the absence of a showing of one of the two situations mentioned in the foregoing quotation—properly reach a finding of voluntary manslaughter is distinctly doubtful. It is apparent that in at least one American jurisdiction this may be done. Ewing v. Commonwealth, 129 Ky 237, 111 SW 352; Smith v. Commonwealth, 133 Ky 532, 118 SW 368; Lewis v. Commonwealth, 140 Ky 652, 131 SW 517; Hunn v. Commonwealth, 143 Ky 143, 136 SW 144. However, either by statute or decision, the prevailing current of authority in the United States is otherwise. For military tribunals, this view is supported by the definition of voluntary manslaughter contained in the Manual for Courts-Martial, supra, paragraph 180a:

"*Voluntary manslaughter is homicide caused by an act likely to result in death, intentionally committed in the heat of sudden passion brought about by provocation.* The law recognizes the fact that a man may be provoked to such an extent that in the heat of sudden passion, caused by provocation, and not by malice, he may strike a fatal blow before he has had time to control himself, and therefore does not in such a case punish him as severely as if the killing were done with malice aforethought. The provocation must be such as the law deems adequate to excite uncontrollable passion in the mind of a reasonable man, and the act of killing must be committed under and because of the passion. The provocation must not be sought or induced as an excuse for killing or doing harm. If sufficient cooling time elapses between the provocation and the blow, the killing is murder, even if the passion persists." (Italics supplied)

It is not necessary, however, that we pass finally on this question. Even if the court-martial in the present case was not justified in finding petitioner guilty of voluntary manslaughter, it did so in fact—and we fail to see how such error could possibly have harmed the accused. The evidence clearly establishes murder. Most jurisdictions of the United States have held that if the evidence warrants conviction in a higher degree of homicide than that found, the appellant may not complain even though the lower degree in fact found is not supported by the evidence. Harrison v. State, 200 Ark 257, 138 SW2d 785; People v. Blackwood, 35 Cal App2d 728, 96 P2d 982; Thompson v. State, 28 Ala App 257, 182 So 410; State v. Burrus, 38 NM 462, 35 P2d 285; Carroll v. State, 140 Fla 433, 191 So 769; Bustin v. State, 184 Miss 1, 185 So 259; Commonwealth v. Jordan, 328 Pa 439, 196 A 10; State v. Dimmitt, 184 Iowa 870, 169 NW 137; Gatlin v. State, 86 Tex Crim 339, 217 SW 698; see Warren on Homicide, section 384.

A brief survey of the evidence indicates forcefully the basis for the observation that there is in the record an ample evidential basis for findings of guilty of murder. On March 27, 1951, several soldiers, including Private Martin, Private Sieh, and petitioner, were drinking together. Martin, Sieh, and petitioner left the group. While they were walking toward a Korean village, Sieh threw several stones at petitioner, meanwhile clamoring for a drink from a liquor bottle in petitioner's possession. Petitioner was carrying a .45 calibre pistol. None of the stones thrown by Sieh struck the accused. After arrival at the Korean village some time later, Martin observed petitioner draw his pistol and, without apparent provocation of any sort, shoot Sieh at close range several times. When the rest of the party arrived subsequently, Sieh was dead, shot through the head. Petitioner, in a pre-trial statement, stated that he had been drinking, and alleged that he had no recollection whatever of the incident. Prosecution witnesses distinctly testified that petitioner was not intoxicated, and there was no evidence of insanity. A court acting reasonably would have been wholly justified in inferring malice—if not premeditation—from this cold-blooded act of homicide. This being so, and conceding the commission of error in permitting the find-

**313**

ing of voluntary manslaughter to stand, we fail to see how this can have harmed petitioner in any way.

Appellate defense counsel further contends that the reception in evidence of various photographs of ▮▮▮▮▮ the deceased soldier and the ▮▮▮▮▮ woman, a Korean national, whom petitioner assaulted, was unnecessary and highly prejudicial. It is well established that a photograph may be admitted in evidence for the purpose of identifying a person, even though it possesses a shocking aspect which might conceivably tend to excite the passion of the jury. Wilson v. United States, 162 US 613, 40 L ed 1090, 16 S Ct 895; Wharton, Criminal Evidence, 11th ed, 1935, page 1321. Ahn Sunil, the Korean woman, was aged, blind, and in extremely poor physical condition. The accused was charged with the commission of a particularly brutal attack upon her. In so far as the photograph was characterized by a shocking aspect not possessed by the subject herself under other circumstances, any danger of prejudice arising from this quality was overborne by the contribution made by it to the court's comprehension of the nature of the accused's misconduct. The photographs of the deceased soldier were admissible to prove the exact nature of his wounds and the manner of death. People v. Smith, 15 Cal2d 640, 104 P2d 510; Commonwealth v. Dreamer, 324 Pa 220, 188 A 117. Here there were several wounds which were discussed at length by various prosecution witnesses, including a medical expert. The photographs served to provide assistance in explaining and illustrating this testimony and enabling the court-martial to determine the cause of death.

It has been urged that the use of a single photograph was sufficient for this purpose, and that the addition of three others presenting the deceased's body from varied angles was unnecessary and interpretable only as an attempt to inflame. We cannot accept this view. In the first place it does not appear to our satisfaction that the three additional prints served no proper purpose and were unnecessary. Further, assuming that the very strictest necessity did not demand their use, we cannot agree that the law member exceeded the bounds of sound discretion in admitting them. The prosecution should, of course, refrain from offering any sort of evidence for an inflammatory purpose. This is elementary. However, if, as here, the item of proof is admissible for a legitimate purpose, the fact that it also may possibly tend in this undesirable direction is, in and of itself, no ground for reversal. Luteran v. United States, 93 F2d 395 (CA8th.Cir), cert den 303 US 644, 82 L ed 1103, 58 S Ct 642; Wigmore, Evidence, 3d ed, 1940, § 1157. In speaking of possible prejudice of this nature, Dean Wigmore has the following to say in the paragraph cited above:

"No doubt such an effect may occasionally and in an extreme case be produced; and no doubt the trial Court has a discretion to prevent the abuse of the process. *But, in the majority of instances where such objection is made, it is frivolous, and there is no ground for apprehension. Accordingly, such objections have almost invariably been repudiated by the Courts."* (Italics supplied) (p 254)

The final issue before us relates to a question asked by the defense counsel of a medical expert who ▮▮▮▮▮ was testifying for the prosecution. Defense counsel asked the witness: "Could it have been possible that the cause of death could have been something other than a bullet?" The Government objected, and the law member sustained the objection. On its face, it would appear that this question, although hardly useful in the premises, was not improper. However, it must be placed in the context of the cross-examination then being conducted. It is necessary that this be set out in some detail as it appears on pages 42 and 43 of the record:

"Q. Doctor Mazer, will you please tell us what type of examination you performed on the body of William Sieh?
A. Yes sir. Upon seeing the body I went over to the body; checked to see if there was any breath. There was no breath. I checked for pulse.

There was no pulse. I then examined the wound.

Q. Did you examine the entire body in the nude?

A. No sir, I did not.

Q. Did you perform an autopsy?

A. No sir.

Q. Then isn't it possible that the cause of death could have been something other than a bullet wound if you didn't take the men's (sic) clothes off?

A. I would say no and I will tell you why. Had the cause of death been something else, the bullet wound would not have caused all that bleeding. The bullet would have undoubtedly killed him; had he died from something else, there would have been no bleeding.

Q. Well isn't it possible that the cause of death could have been something else?

A. Well I don't believe I am here to testify as an expert witness.

Defense: I believe your reputation as an expert has been established.

Law Member: The witness is correct.

A. Sir, had I taken the man's clothes off, it still would have established the bullet wound as the first cause of death until a post-mortem could have determined it; however, there is no doubt in my mind that the bullet was the cause of death.

Defense: If it please the court, I haven't received an answer. Could it have been possible that the cause of death could have been something other than the bullet?

TJA: If it please the court, prosecution will object to that. The Doctor has been placed on the stand to testify as a Medical Officer, to testify to what he saw. We have established the Doctor as an expert.

Law Member: The objection is sustained. The information can be elicited in a series of single questions.

Defense: I withdraw the question and have no further questions.

Law Member: Does the counsel understand I am not objecting to the type of question but only the manner in which it was put. You can elicit the same information in a series of single questions.

Defense: I believe I have obtained the necessary information."

It is quite apparent that the law member sustained the objection only as to form and not to substance. By rewording the question defense counsel could easily have elicited whatever information he desired. Furthermore, the only proper—or even possible—answer which could have been obtained through the use of the challenged question was already present in the doctor's statement that the cause of death could not have been anything other than a bullet wound. Certainly under the facts of this case the doctor could not testify, as a medical expert, that the bullet wound might have been caused by a shot fired by a third person—someone other than the accused. All of these circumstances lead us to the conclusion that petitioner was in no way prejudiced by the law member's ruling.

In view of the serious issues presented by this case, we have examined the record carefully. We have found no other instances of error which could possibly have prejudiced petitioner. Finding no merit in the four contentions discussed separately above, we must affirm the decision of the board of review.

Chief Judge QUINN and Judge LATIMER concur.