UNITED STATES, Appellee,

v.

Ronnie D. POOLE, Corporal, U.S.
Marine Corps, Appellant.

No. 62,907.
NMCM 88–3663.

U.S. Court of Military Appeals.

Argued March 13, 1990.

Decided Aug. 10, 1990.

For Appellant: *Lieutenant Fredric D. Firestone,* JAGC, USNR (argued).

For Appellee: *Major Laura L. Scudder,* USMC (argued); *Commander Thomas W. Osborne,* JAGC, USN (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

In February 1988, Corporal Poole was tried by a special court-martial with officer and enlisted members on a charge that "at an unknown location, between about 18 August 1987 and 27 August 1987," he had "wrongfully use[d] cocaine," in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. Contrary to his pleas, he was convicted and sentenced to a bad-conduct discharge and reduction to pay grade E-1. The convening authority approved the sentence; and in an unpublished opinion the Court of Military Review affirmed the findings and sentence. We granted review on these two issues:

I

WHETHER THE RESULTS OF THE ANALYSIS OF APPELLANT'S URINE SAMPLE WERE INADMISSIBLE.

II

WHETHER THE MILITARY JUDGE ERRED TO APPELLANT'S SUBSTANTIAL PREJUDICE BY ALLOWING HIS COMMANDING OFFICER TO TESTIFY ON THE MERITS AS TO THE UNDERLYING REASONS WHY APPELLANT WAS ORDERED TO PROVIDE A PROBABLE CAUSE URINALYSIS.

We decide in appellant's favor on both issues.

I

On the evening of August 26, 1987, Poole and two fellow Marines, Corporal Brown and Lance Corporal Ramos, were together in Rio de Janeiro, Brazil, on shore leave from the Marine detachment to which they were assigned aboard the USS BARNSTABLE COUNTY. The three men were a few yards from a police station when they were arrested by Brazilian police for alleged use of marijuana. Early the next morning, Lieutenant Apodaca, who was the Officer-of-the-Day[1] on the vessel, obtained their release from Brazilian officials on the condition that the three Marines not be given further liberty in Rio.

Lieutenant Apodaca, who spoke Portuguese, had been informed by the Brazilian police that the arrest had been made because they were certain that they had smelled marijuana near the three Marines. However, when the Marines had been strip searched and their clothing and personal effects examined, no evidence of drugs or drug paraphernalia had been discovered. The three Marines denied to Apodaca that they had used marijuana and claimed that they had been smoking tobacco cigarettes at the time of their arrest.

On the morning of August 27, Major Goulding, who commanded the Marine detachment, ordered that the three Marines submit urine samples for testing. At that time, Goulding was aware that "[t]he police expressed to Lieutenant Apodaca they were certain the men had been smoking marijuana, but that there was no evi-

---

**1.** The defense brief says this is Officer of the Deck, but the record says Officer of the Day (R. 27).

dence." Goulding "came to the conclusion that there was strong reason to believe that drug use had taken place by these three Marines"; and so he concluded that he "had probable cause to seize and search urine samples from the three Marines." Goulding told Captain Corbett, the company commander, "to go out and seize the samples." He also "told him to do a field test initially"; and at the same time he told Corbett "to do a normal urinalysis the kind you mail off." He had ordered both tests because the "field test is the instant feedback, if you will. A lab, a send away test, for want of a better term, is more conclusive, and in my estimation it is fairer to both the accused and the Marine Corps." Major Goulding didn't "recall ordering a" second field test.

Pursuant to Major Goulding's order, urine specimens were obtained from all three Marines on the morning of August 27 and were properly field tested. The test gave negative results as to Poole and Brown but positive as to Ramos. Later that day, urine specimens were again obtained from the three men—at the instance of Captain Corbett. This time the field test yielded negative results as to all three Marines.

On the morning of August 28, a third urine specimen was obtained from each Marine and was transmitted to a laboratory for testing. In this instance, the test also proved negative for marijuana; but it was positive for cocaine as to all three Marines. This test gave rise to the charge of wrongfully using cocaine of which Poole was convicted. The military judge's denial of his motion to suppress the results of this test forms the basis for the first issue on which we granted review.

## II

In *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), the Supreme Court considered the legality of a warrantless arrest made when police en-

tered a hotel room after smelling burning opium while they were standing in a hallway outside the room. All of the police "were experienced in narcotic work and recognized at once a strong odor of burning opium which to them was distinctive and unmistakable," *id.* at 12, 68 S.Ct. at 368, and which led to the hotel room. While the Court invalidated the arrest because no warrant had been obtained, it rejected the defense "contention ... that odors cannot be evidence sufficient to constitute probable grounds for any search." Instead, the Court opined:

> If the presence of odors is testified to before a magistrate and he finds the affiant qualified to know the odor, and it is one sufficiently distinctive to identify a forbidden substance, this Court has never held such a basis insufficient to justify issuance of a search warrant. Indeed it might very well be found to be evidence of most persuasive character.

*Id.* at 13, 68 S.Ct. at 369.

Major Goulding, who determined that probable cause existed to obtain the urine specimens, did not hear testimony or receive affidavits from any of the Brazilian police officers who claimed to have smelled the odor of marijuana; and so he was not in a favorable position to evaluate their reliability [2] or to find that the persons who purportedly had smelled marijuana were qualified to know its odor. Moreover, he had been informed that no evidence of drugs or drug use had been found when the three Marines and their clothing had been thoroughly searched.

Thus, Major Goulding was relying completely on the report to him by Lieutenant Apodaca that the Brazilian police "were certain" that they had smelled marijuana where the three Marines were strangely located—which happened to be right at the steps of a Rio police station. Undoubtedly, Major Goulding's determination of probable cause also relied on the assumption that marijuana has a "sufficiently distinctive"

---

**2.** Major Goulding testified on direct examination that, before the incident involving appellant, there had been some "shakedown prob-

lems" with Brazilian police involving false arrests and demands for money. However, these "problems" had not arisen in Rio.

odor to be readily identified and that police officers in Rio usually would be "qualified to know the odor."

We shall assume, without deciding, that Major Goulding had probable cause to direct Poole and his two companions to submit urine specimens for testing on the morning of August 27. On that assumption, the relevant question then becomes whether, on the morning of August 28, Corporal Poole could be lawfully compelled to provide a urine specimen for a laboratory test.

■ The Government takes the position that, if on the morning of August 27 Major Goulding had probable cause to order a compulsory urinalysis, this probable cause would provide an adequate basis for ordering Poole to furnish not only a urine specimen for field testing on August 27 but also another specimen the next morning to be transmitted to a laboratory for testing. The suggested analogy is to making several entries into a defendant's car pursuant to a single search warrant. *United States v. Huslage*, 480 F.Supp. 870 (W.D.Pa.1979); *see also United States v. Giacalone*, 455 F.Supp. 26 (E.D.Mich.1977), *aff'd* 606 F.2d 673 (6th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1646, 64 L.Ed.2d 235 (1980).

We reject the analogy. The requirement that a servicemember report at several different times for his urine to be "seized" is more intrusive on his privacy than for police to make several entries into his automobile as part of a single transaction and pursuant to the same warrant. Although a servicemember necessarily undergoes many restrictions on his freedom and must be present at the places designated by his superiors,[3] he does have a Fourth Amendment interest in not being required to report repeatedly for compulsory urinalyses based on the same purported probable cause.

■ In this connection, we must take into account that the furnishing of urine specimens—especially under visual observation—*cf. Unger v. Ziemniak*, 27 MJ 349 (CMA 1989)—is not an especially pleasant experience. In short, Major Goulding was not entitled to repeat or protract the testing process indefinitely, even if he had probable cause to order a urine test on the morning of August 27.

After Poole's first urine specimen had been tested and proved negative, a second field test was directed. It is unclear whether this was done independently by Captain Corbett, who was appellant's company commander, or pursuant to the instructions from Major Goulding, who could not recall ordering such a test. In any event, the second test, which also proved negative, was accomplished pursuant to the direction of appellant's military superiors. Under these circumstances, even though the third test, a laboratory test, would be more accurate than a field test, we conclude that obtaining this specimen was unreasonable, when based solely on whatever probable cause had existed the previous day.

Furthermore, we are convinced that the probable cause that existed the previous day was undercut by subsequent events. On the first field test, both Poole and Brown had tested negative and only Ramos had tested positive. These results did not reinforce the probable cause to test Poole. Instead, the most logical inference would be that, if the Brazilian police had smelled marijuana near the three Marines, it probably had emanated from Ramos and that Poole and Brown had not been using this substance. When the negative results of the first field test of Poole's urine were confirmed by the second field test of a different specimen, the information on which Major Goulding had relied for probable cause to obtain a urine sample from Poole became even more suspect.

Probable cause for a search can exist at one time but because of "staleness"—the passage of time—can evaporate.[4] For ex-

---

3. *See, e.g., United States v. Schneider,* 14 MJ 189, 192 (CMA 1982).

4. W. LaFave, *Search and Seizure* § 3.7(a), at 75–88 (2d ed. 1987); *Sgro v. United States,* 287

ample, if an informant reports having seen drugs in a suspect's car yesterday, the probable cause for searching the car is much greater than if the informant said that he had seen the drugs in the car a month ago.

However, passage of time is not the only subsequent event that may dissipate probable cause. Subsequently-received information which negates or provides an innocent explanation for the information initially relied on in finding probable cause also can destroy the basis for finding probable cause.[5] For example, if a police officer reports to a magistrate that he has seen a pistol in an automobile, there would be greater probable cause to search for the weapon than if, after making the initial report, he provides supplemental information that the "pistol" was actually a child's toy which had been designed to look like a weapon.

Even though Major Goulding did not "recall ordering" the second field test and did not make clear when he learned of its results, we believe that he must be charged with notice of the information obtained from this test by his subordinate, Captain Corbett. This second negative field test of appellant, coupled with the weak grounds initially for authorizing the search, removed any probable cause for ordering further "seizures" of Poole's urine. Thus, Poole should not have been compelled to provide a urine specimen on the morning of August 28; and the results of the laboratory test should have been excluded. Since this evidence was of major importance to the Government's case, its reception was prejudicial error.

### III

During the trial on the merits and over defense objection, the Government was allowed to offer Major Goulding's testimony "as to what information he received based upon this arrest by the Brazilian police and what it did, in his mind, to cause him to order a probable cause urinalysis of Corporal Poole." This testimony was clearly inadmissible.

A determination of probable cause is often based on hearsay evidence and other evidence that would be inadmissible in a trial on the merits. For example, Major Goulding's determination of probable cause to order the three Marines to provide urine specimens was based on the odor that Lieutenant Apodaca told him that the Brazilian police had said they had smelled.

Furthermore, insofar as Poole's guilt or innocence was concerned, what difference did it make why Goulding had ordered the test? The only relevant evidence concerned the outcome of the test—not the reason for conducting the test. The situation is akin to a case where the military

---

U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932). *See also United States v. Queen*, 26 MJ 136, 139 (CMA 1988); *United States v. Johnson*, 23 MJ 209, 212 (CMA 1987).

5. In dealing with probable cause for arrest, Professor LaFave points out that, *"[a]ssuming no contrary facts later come to light*, this probable cause will continue to exist for an indefinite period." LaFave, *supra* at 75 (emphasis added). In *State v. Bell*, 334 So.2d 385, 387 (La.1976), it was noted that "an arrest warrant [normally] does not become 'stale' with the passage of time ... because grounds for arrest, once established, will continue to exist indefinitely, *assuming that no new facts have come to light."* (Emphasis added.) In *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), Justice Powell, concurring, noted:

The probable cause to support issuance of an arrest warrant normally would not grow stale as easily as that which supports a warrant to search a particular place for particular objects. This is true because once there is probable cause to believe that someone is a felon the passage of time often will bring new supporting evidence. *But in some cases the original grounds supporting the warrant could be disproved by subsequent investigation that at the same time turns up wholly new evidence supporting probable cause on a different theory. In those cases the warrant could be stale because based upon discredited information.*

423 U.S. at 432 n. 5, 96 S.Ct. at 832 n. 5 (emphasis added). Although the quoted comments concern grounds for arrest, we believe that the same principle applies with respect to searches—namely, that information which at the outset would seem to be sufficient to establish probable cause will not be sufficient if discredited by later-acquired information.

judge erred in allowing the Government to show why its undercover agent had targeted a particular individual whom he asked to engage in a drug transaction. *See United States v. Gaeta,* 14 MJ 383, 389 (CMA 1983); *see also United States v. Watson,* 11 MJ 483, 485 n. 3 (CMA 1981).

To make things even worse, Major Goulding's testimony made the court members aware that, not only was Poole charged with cocaine use, but also he had been suspected of using marijuana—a separate offense. *Cf.* Mil.R.Evid. 404(b), Manual for Courts–Martial, United States, 1984.

In this hotly contested case, admission of such testimony was prejudicial error. Therefore, even if we were not reversing because of the Fourth Amendment violation in obtaining the third urine specimen from Poole, the error in receiving Major Goulding's testimony regarding the probable cause would require reversal. Since this results in exclusion of the only available evidence of the offense, a rehearing may not be held.

## IV

The decision of the United States Navy–Marine Corps Court of Military Review is reversed. The findings and sentence are set aside. The Charge is dismissed.

Judge COX concurs.

SULLIVAN, Judge (dissenting):

Concerning the first granted issue, I find the multiple seizures of appellant's urine over a short period of time were based on probable cause and were within the scope of the commander's original authorization. *See also United States v. Bickel,* 30 MJ 277 (CMA 1990). For the second issue, I agree with the Court of Military Review that the error was harmless.