UNITED STATES, Appellee,

v.

Donald R. BURKS, Jr., Master Sergeant,
U.S. Air Force, Appellant.

No. 67,494.
ACM 28760.

U.S. Court of Military Appeals.

Argued Nov. 4, 1992.

Decided April 29, 1993.

For Appellant: *Captain George F. May* (argued); *Major Alice M. Kottmyer* (on brief); *William J. Holmes, Colonel Jeffrey R. Owens, Lieutenant Colonel Terry J. Woodhouse.*

For Appellee: *Lieutenant Colonel Jeffrey T. Infelise* (argued); *Lieutenant Colonel Brenda J. Hollis, Major Morris D. Davis, Captain David C. Wesley* (on brief); *Colonel Richard L. Purdon* and *Major Paul H. Blackwell, Jr.*

## Opinion of the Court

WISS, Judge.

A general court-martial with officer members tried appellant for premeditated murder and aggravated assault, *see* Arts. 118 and 128, Uniform Code of Military Justice, 10 USC §§ 918 and 928, respectively. After a contested trial, the members convicted appellant of unpremeditated murder and aggravated assault, and sentenced him to a dishonorable discharge, confinement for life, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review unanimously affirmed them in an unpublished opinion dated August 26, 1991.

On appellant's petition, this Court granted review of four issues, three of which address evidentiary questions at trial and the fourth concerns multiplicity of his two convictions for sentencing purposes. Now, after further review, we affirm.

On the morning of September 25, 1989, Sergeant Handy was savagely beaten to death by repeated blows to and about his head while working alone on a night shift in the civil engineering service-call office. Behavioral Analysis Interviews by agents of the Office of Special Investigations (OSI) narrowed the list of possible suspects to about twelve, including appellant. A number in that group agreed to take polygraphs; appellant's result was interpreted as deceptive on some critical questions, so he then "became a suspect."

Over the next 2½ days, appellant voluntarily submitted himself to interrogation by OSI agents on repeated occasions and consented to searches of his house, car, gym locker and bowling alley locker. Ultimately, appellant confessed to killing Handy by numerous blows with an aluminum baseball bat. Appellant followed his oral confession with "his own typed version," which then was "expanded upon in a second type[d] confession" that appellant signed.

Appellant's confessions reflect outrage at Handy's alleged admission to having molested a young girl and his alleged bragging that he was getting away with it. Appellant apparently decided to beat Handy to scare him into not repeating such conduct. After he had beaten him with the bat in Handy's office, appellant "escorted" him to the men's bathroom to assist Handy in cleaning up the blood; however, once there, he initiated a second beating that killed Handy.

Three days later, appellant "recanted his confession[s]" and claimed that OSI agents had induced him into making them. In their stead, he claimed that three men with "stars painted on their cheeks and earrings in their right ears" had "forced him to" take them to where Handy worked, where two of them beat him to death with a bat and an unusual weapon of some sort. He stated that they threatened to injure his children if he mentioned any word of this assault for 4 weeks. Unpub. op. at 2.

With this brief evidentiary background, we can proceed to consider appellant's complaints of error.

### I

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY EXCLUDING EXCULPATORY EVIDENCE THEREBY DENYING APPELLANT HIS DUE PROCESS RIGHT TO PRESENT A DEFENSE.

### A

About 2 months after appellant had recanted his confessions, security police

found a 16–page, handwritten letter under the brake pedal of an unlocked van that had been used to transport prisoners. The letter was addressed to appellant and was signed by "Michael," who claimed that he had been Handy's "homosexual lover." Unpub. op. at 3.

According to an OSI transcription of the letter, which has been stipulated to as authentic, "Michael" explained that he had written because he wanted appellant "and all Joseph's [Handy's] friend [sic] to know the truth about Joseph and why he died." This "truth" was that Handy, through "Michael," had become entwined in a cult "family" that was involved with drugs and child sex; Handy purportedly never had engaged in such activities himself and had, instead, gathered a "package" of incriminating information to turn over to officials. "Michael" revealed: "Joseph was sacrificed by the family because he was going to betray our father [the leader of the cult] by turning over information to the air force official [sic] just to clear his name. Our brother in faith brother Rodriguez and brother Martinez and brother Williams was [sic] told by our father in faith to kill Joseph and get the information he had about our family." "Michael" also mentioned unusual trademarks of such an assassination by the "family," such as a weapon with "a star on it" and the assassin wearing a star on his or her right cheek.

Appellant had ridden in the van the morning that the letter was found, but he had ridden in the back seat with other prisoners and had been handcuffed. Authorities were unable to determine who had written the note or how it had been placed in the van. Further, the letter indicated that "Michael" also had "written letter [sic] to the local newspapers and Air Force authorities explaining everything that happen [sic] and why. I sent Air Force authorities a list of names and numbers also a map." Notwithstanding, no additional communications from "Michael" ever came to light.

### B

The defense indicated from the outset of trial that its theory of the case was that a homosexual cult, not appellant, had killed Handy and that appellant had confessed only to protect his children from the threatened harm to them if he talked within a month of the incident. Although the defense relied upon various items of evidence and testimony to support this theory, the two principal pillars upon which it was to be built were appellant's own testimony to this effect and the letter from "Michael."

Accordingly, prior to trial, appellant moved to admit, *inter alia*, "Michael's" letter. Defense counsel offered four bases for admission: constitutional due process; Mil.R.Evid. 804(b)(3), Manual for Courts-Martial, United States, 1984, statement against interest; Mil.R.Evid. 804(b)(5), residual hearsay exception where declarant is unavailable; and Mil.R.Evid. 803(24), residual hearsay exception where the declarant's availability is immaterial. Assistant trial counsel objected, contending that there was no assurance at all that this hearsay evidence was trustworthy.

After spirited litigation, the military judge denied the motion. As to Mil.R.Evid. 804(b)(3), the military judge noted that such statements "are not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statements." He concluded that he did "not find a clear indication of trustworthiness of the statement in this case. The fact that some of the details in the statement are true does not serve to validate the entire statement. The fact that the declarant is unknown makes it impossible to attach any credibility or trustworthiness to the statement."

The military judge applied the same analysis to the requirements of Mil.R.Evid. 803(24) and 804(b)(5), each of which requires "equivalent circumstantial guarantees of trustworthiness" as are found in the specific hearsay exceptions. He determined that "there is absolutely no way to test the trustworthiness of what amounts to an anonymous statement, a statement by an unknown author." He similarly rejected the argument that constitutional due process required admission of the letter:

"The statement has none of the persuasive assurances of trustworthiness found by the Supreme Court in *Chambers versus Mississippi* [, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ]."

In sum, as to all four bases urged by the defense, the military judge's conclusion is best reflected by the following comment: "This anonymous letter does not even come close to the threshold requirements for trustworthiness and reliability." Furthermore, as a final point, the military judge applied the standard of Mil.R.Evid. 403 and found "that any possible probative value of this statement is substantially outweighed by the danger of confusion of the issues in the case. This application of M.R.E. 403 also leads me to conclude that the statement will not be admitted."

### C

■ In this Court, as he did in the Court of Military Review, appellant continues to urge the same bases for admissibility of the letter.[1] To support his burden as the profferer of the hearsay evidence to show that the letter comes within an exception to the rule excluding hearsay, *see* Mil.R.Evid. 802, appellant has pointed to a number of factors that he contends are circumstances assuring trustworthiness, *see* Mil.R.Evid. 803(24) and 804(b)(3) and (5). We are not persuaded.

Each of the factors urged by appellant seems to fall into one of three general categories. First, appellant argues that certain "statements in the letter are factually correct." Final Brief at 14. For instance, the letter states that Handy's "father was deceased" and that his brother had been killed, as well as that Handy had been "under investigation for child molestation." Notwithstanding their claimed truth, none of these factors was outside the realm of possible knowledge of any number of people, including appellant. Indeed, in his confessions made 2½ days after Handy's murder, appellant unequivocally revealed his awareness that Handy had

been a suspected child sexual abuser. Moreover, as Handy's supervisor and co-worker, appellant could reasonably be expected to know certain highlights of Handy's family history.

Second, certain events or other statements in the letter "are corroborated by other evidence." Final Brief at 15. The letter, for instance, describes the lethal weapon as one with a star on it and indicates that more than one person was involved in the murder. In comparison, other evidence of record indicates that some of the blows to Handy may have been delivered by some weapon other than a baseball bat—which was the only murder weapon recovered—and that a bloody shoeprint on Handy's chest did not match any of the footwear found in appellant's quarters—permitting the inference that someone other than or in addition to appellant was involved.

Neither these examples nor other "corroboration" urged by appellant are particularly telling, however. For instance, appellant's own recantation 2 full months before the letter was found mentioned killers associated in various ways with stars and that the killers had used a bat and some other "unique weapon." Unpub. op. at 2. As to the shoeprint, the Government appropriately suggests that appellant could easily have disposed of his bloody shoes after murdering Handy. Answer to Final Brief at 5. In other words, any coincidence between statements in the letter and other evidence is not necessarily probative either that "Michael" wrote the letter or that appellant himself or someone at appellant's behest wrote it.

Finally, appellant points to several miscellaneous factors that, notwithstanding, seem rather neutral as to his burden of showing the letter's trustworthiness. A documents' examiner's comparison of appellant's handwriting with the letter ended as "inconclusive," and no clinching evidence of fabrication was uncovered. Nei-

---

1. The granted issue, raised by appellant, appears to be more restricted in its theory of error; since appellant argues all four bases in his brief, however, we will consider them.

ther of these does much, however, toward meeting appellant's affirmative burden of showing the letter's trustworthiness.

All said, we hold that, even if this type of "corroboration" may be considered to determine whether appellant met the requirements of Mil.R.Evid. 803(24) and 804(b)(5) to show "equivalent circumstantial guarantees of trustworthiness" akin to specific hearsay exceptions, cf. *United States v. Lyons*, 36 MJ 183 (CMA 1992), the factors relied upon in this case are insufficient to do so. For similar reasons, we reach the same conclusion as to Mil.R.Evid. 804(b)(3).[2]

█ Appellant fares no better with his constitutional due-process argument. The Supreme Court in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), emphasized that, in that case, the excluded confessions "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Id.* at 300, 93 S.Ct. at 1048. Yet, they had been excluded from evidence because of mechanical application of the rules of evidence.

The residual hearsay exceptions are a giant step toward resolving that injustice within the evidence code. *See also* Mil. R.Evid. 102 ("These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined."). In any event, nothing in *Chambers* supports the proposition that a defendant, who otherwise is permitted to present his defense, is denied constitutional due process of law because certain evidence—the fundamental trustworthiness of which is wholly unestablished by the defendant—is excluded from

the trial. *See United States v. Hinkson*, 632 F.2d 382, 386 (4th Cir.1980).

## II

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY ADMITTING INTO EVIDENCE CERTAIN SCIENTIFIC EVIDENCE NOT ACCEPTED AS CONCLUSIVE IN THE SCIENTIFIC COMMUNITY.

### A

Before trial on the merits began, trial counsel advised the military judge that he intended to question Agent McGibbon regarding a "presumptive-positive" luminol test for blood in passenger areas of appellant's car. That test was run in the course of a consent search of the car during the period of appellant's interrogation. Defense counsel pointed out that subsequent tests did not show positive in these areas but showed positive only on carpeting in the car's trunk. Assistant trial counsel responded that these subsequent tests were *"less sensitive"* than luminol (that is, required more blood to be present in order to show positive) but *"more accurate"* than luminol (that is, would not show positive for some chemical substances similar to blood that would show positive in the luminol test). (Emphasis added.)

The prosecutor explained that he wanted to elicit testimony about the luminol test merely to show the progress of the OSI investigation and to explain, in part, why that investigation had focused on appellant. He went on to suggest limiting instructions as to this purpose. Then, in response to defense objection, he further argued that any possible prejudice to appellant would

**2.** Additionally, as to Mil.R.Evid. 804(b)(3), Manual for Courts–Martial, United States, 1984, we are at a loss to understand how it may logically be concluded that the *anonymous* writer of a self-incriminating letter has made any statement that truly is against the writer's penal interests. As the Government cogently fingers the flaw: "[W]hose interest was it against? There has

never been a person linked with the letter." Answer to Final Brief at 6. A "confession" by one who speaks from the shadows and remains unidentifiable hardly measures up to the rationale that a statement made against the declarant's own interests is, therefore, reliable. *See United States v. Johnson*, 3 MJ 143 (CMA 1977).

be overcome by other evidence showing the results of the subsequent tests.

In due course, the military judge overruled appellant's objection. He remarked: "I don't see the information as being particularly prejudicial. It has some probative value, and the individual [Agent McGibbon] ... [could] explain the limited usage of the test. That information will be of some assistance to the court in deciding the case." *See* Mil.R.Evid. 403. He reminded trial counsel of his offer to provide appropriate limiting instructions.

During trial, Agent McGibbon testified as anticipated. He explained that he had tested certain parts of appellant's car for blood. First, he used phenolphthalein, which tested negative; then he used luminol, which showed a presumptive positive in certain areas. As a result of that presumptive positive, he "asked the local sheriff's department to conduct further testing.... He testified that luminol is only a presumptive test" that required "further confirmatory testing." Further, he indicated that the presumptive positive was not necessarily "caused by blood, much less by *human* blood." Answer to Final Brief at 9–10 (emphasis added).

After Agent McGibbon had finished, the military judge instructed the members as follows:

> Members, when Mr. McGibbon testified, he talked about luminol testing. Since the luminol testing is essentially a screening test, you may not consider the testimony as to the luminol testing as confirming the results indicated. The evidence as to the luminol testing was presented for the limited purposes of showing the OSI's continuing efforts and why the accused continued to be a suspect

and not to confirm the presence of blood in the accused's vehicle. Any questions? *Apparently not.*

Thereafter, Mr. Gregonis, a forensic serologist in the crime laboratory of the local sheriff's department, testified. He stated that his later testing of appellant's car for blood "was negative except for a weak positive on an area of" the trunk's carpet. Answer at 10.

### B

Although evidence about why an investigator focused on a particular target usually will be irrelevant, *see United States v. Poole,* 30 MJ 271, 275–76 (CMA 1990), appellant's trial strategy changed that in this case. Appellant's explanation for his confessions to OSI agents was that the police had brow-beaten him into making them, and Agent McGibbon's testimony offered an explanation about why, in part, the agents continued to pursue appellant as a suspect.

Of course, that probative value might still, in a given case, be substantially outweighed by the danger of unfair prejudice. Mil.R.Evid. 403. Here, though, the military judge assured that would not be the case. Not only did he offer clear and accurate instructions to the members that properly limited their consideration of the luminol test, but he was assured by the prosecutor that later testimony would show that the presumptive-positive luminol test in the passenger compartment was not confirmed in subsequent testing. This combination of limiting instructions and Mr. Gregonis' testimony virtually assured that appellant would not be unfairly prejudiced by Agent McGibbon's testimony.[3]

---

3. Notwithstanding the limiting instruction, trial counsel remarked during his closing argument to the members:

> And then he says that it was—in the front it was the other guys who did it, that he was away a little bit but it was the other guy standing over the victim and beating him, that the other guy got soaked with blood. These other guys went out and got in the back of his car without changing their clothes, and *there's no blood found in the back of his car, that is,*

*in the rear passenger section. The only blood found which led them on was in the front.* (Emphasis added.) Although this comment strayed from the permissible limits of the evidence just discussed, defense counsel did not object to the argument and so waived his appellate complaint. *See* RCM 919(c), Manual, *supra.* In the context of this case and considering all the other evidence, including appellant's confessions, this isolated remark was not plain error that this Court will notice even in the ab-

## III

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY THE ADMISSION OF CERTAIN PHOTOGRAPHS OF THE VICTIM AND THE CRIME SCENE WHICH WERE UNFAIRLY PREJUDICIAL AND CUMULATIVE OF OTHER PROPERLY ADMITTED PHOTOGRAPHS.

During trial, the defense objected to eighteen photographs of the victim and crime scene and a videotape of the crime scene offered by the prosecution. Partially overruling the objection, the military judge admitted ten of the photographs, excluding the remaining photos as well as the videotape. Of the ten, four were of the victim: One was a color photo taken at the murder scene, and the other three were black-and-whites from the autopsy.

Throughout his appeal, appellant has complained that the four photographs of the victim that were admitted unfairly inflamed and shocked the members. *See United States v. White*, 23 MJ 84 (CMA 1986). The Government, in response, acknowledges the nature of the pictures but argues that they necessarily and appropriately reflect the violent nature of the attack on Handy. The Government points out, as it did at trial, that it had elected not to offer more graphic autopsy pictures out of a similar concern as appellant's.

Appellant is correct "that photographs are not admissible for the illegitimate purpose of inflaming or shocking the court-martial." *Id.* at 88. *See* Mil.R.Evid. 403. He must remember, however, that, "[i]f 'the item of proof is admissible for a legitimate purpose, the fact that it also may possibly tend in this undesirable direction is, in and of itself, no ground for reversal.' *United States v. Bartholomew*, 1 USCMA 307, 314, 3 CMR 41, 48 (1952)." 23 MJ at 88.

■ Our review of the photographs in the context of their use at trial during testimony of prosecution witnesses per-

suades us that the military judge correctly ruled that the "probative value" of the photographs "far outweigh[ed] the danger of unfair prejudice" to appellant. As we concluded in *United States v. White, supra* at 88:

> [T]he photographs were introduced for a legitimate purpose and aided the fact-finding process by making ... testimony easier to understand. Of course, "[a person who has been brutally murdered by a vicious beating to his head] is not a pretty picture[.]" Here, however, the probative value of the evidence far outweighed any danger of unfair prejudice. Accordingly, we find no abuse of discretion by the military judge in admitting the photographs.

(Citation omitted.)

## IV

WHETHER THE COURT OF MILITARY REVIEW ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT IN HOLDING THAT CHARGE I, MURDER BY STRIKING WITH A BASEBALL BAT, AND CHARGE II, ASSAULT BY STRIKING WITH A BASEBALL BAT, WERE NOT MULTIPLICIOUS FOR SENTENCING.

■ The military judge appropriately submitted to the members the issue as to how these events had unfolded. He instructed them that, if they found appellant had gone to see the victim with the specific intent to kill him, the two charges would be multiplicious for findings; in that event, they should find appellant not guilty of Charge II, the assault. However, if they believed what appellant had stated in his confessions—that he went to Handy's workplace only to beat a lesson into him and then, after escorting him to the bathroom to help him clean up the blood, had changed his mind and decided to kill him by another, fatal beating—the charges would not be multiplicious.

By their separate findings of guilty to both charges, the members have indicated

sence of objection. *See United States v. Fisher,* 21 MJ 327 (CMA 1986).

their factual conclusion of appellant's intent. Now he complains, however, that they should be treated as multiplicious for sentencing.

At the outset, it must be noted that appellant did not raise sentence multiplicity as an issue at trial. Moreover, given the implicit finding of fact discussed above, appellant's crimes were not offenses arising from a single impulse or insistent flow of events with like object or intent of the sort that this Court has sometimes treated as multiplicious for sentencing, *see United States v. Burney*, 21 USCMA 71, 74–75, 44 CMR 125, 128–29 (1971); rather, they were two distinct criminal acts. *Cf. United States v. Traeder*, 32 MJ 455, 456–57 (CMA 1991). Accordingly, appellant's argument to the contrary is without merit.

## DECISION

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and GIERKE concur.