UNITED STATES, Appellee,

v.

Kenneth C. QUEEN, Electronics Technician Third Class, U.S. Navy, Appellant.

No. 53,123.

NMCM 841588.

U.S. Court of Military Appeals.

May 23, 1988.

For Appellant: *Lieutenant Commander Robert J. Smith*, JAGC, USN (argued); *Lieutenant J. Cunyon Gordon*, JAGC, USN (on brief).

For Appellee: *Lieutenant Blair E. Smircina*, JAGC, USNR (argued); *Captain Carl H. Horst*, JAGC, USN and *Lieu-*

*tenant P.J. Battin,* JAGC, USNR (on brief).

## Opinion

EVERETT, Chief Judge:

Pursuant to his pleas, appellant was convicted by a general court-martial composed of officer members of two violations of Navy regulations prohibiting usury, in violation of Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892. Contrary to his pleas, Queen was also found guilty of violations of Navy regulations by wrongfully possessing a pistol and bullets, and drug paraphernalia on May 18, 1983; misappropriation of tools belonging to the Navy; wrongful possession of various drugs on May 18, 1983; wrongful distribution of marijuana on or about April 18, 1983; and wrongful communication of a threat of bodily harm on May 9, 1983, in violation of Articles 92, 121, and 134, UCMJ, 10 U.S.C. §§ 892, 921, and 934, respectively. The court-martial sentenced appellant to a bad-conduct discharge, confinement and forfeiture of $380.00 pay per month for 18 months, and reduction to the lowest pay grade. The findings were modified slightly by the convening authority, but the sentence was approved as adjudged.

The Court of Military Review disapproved the conviction of communicating a threat and reduced the confinement by 6 months, but otherwise it affirmed the findings and sentence. 20 M.J. 817 (1985). We granted review of this issue:

> WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY RE-VIEW ERRED BY UPHOLDING THE MILITARY JUDGE'S DENIAL OF A MOTION TO SUPPRESS THE FRUITS OF A SEARCH, AND BY APPLYING THE "GOOD–FAITH EXCEPTION" TO A VALID WARRANT REQUIREMENT.

### I

On May 18, 1983, appellant's car, parked on a lot at the Long Beach Naval Station, was searched; and a pistol, illegal drugs, drug abuse paraphernalia, and tools belonging to the Navy were discovered. At his trial, appellant moved to suppress this evidence, which related to several of the charges against him. The basis for the motion was that there had been

> noncompliance with Rule 315f of the Military Rules of Evidence in that, the Commanding Officer was not furnished correct information and had insufficient information made available to him to meet the credibility prong of the *Aguilar* test and secondly, that there was insufficient information for him to have probable cause to believe that the evidence they were searching for in this particular incidence, a pistol and ammunition, was located within the vehicle on—for the reason that the information furnished to the Commanding Officer was stale in that, it was rather than two weeks old as stated in the authorization for search which was executed subsequent to the search, but rather was six weeks old as is evident from the statement from the individual relied upon as the—furnishing the information to Lieutenant Commander Peck, who was the XO of the USS Young and who communicated the information to the Commander, Naval Station, Long Beach.

In opposition to the defense motion, the Government called as a witness Captain (USN) Don Barnhart, the Commanding Officer of the Naval Station, Long Beach, who had authorized the search of Queen's private vehicle on May 18, 1983. At the time this car was in a parking lot at a recreational park on the Naval Station. According to the search-authorization record, Captain Barnhart had been advised by Lieutenant Commander D.L. Peck, Executive Officer of the USS JOHN YOUNG, "that he suspected" Queen "of threatening to inflict grievous bodily harm and requested permission to search" Queen's vehicle "for a hand gun and ammunition." The reasons for suspecting appellant as recited in the authorization were as follows:

> Information was supplied to LCDR Peck concerning a threat made by QUEEN to two crewmembers that he would kill

them if they told on him for dealing narcotics. The crewmembers, who were classified as "Confidential Informants" at this time were under oath and reported seeing a hand gun in QUEEN's car approximately two weeks ago. The Executive Officer, fearing for the safety of the "Confidential Informants," hereby executes this request for Authorization to Search for hand gun and ammunition which he suspects to be contained in QUEEN's vehicle. The XO informed the Commanding Officer that the suspect lived on the ship and had not checked a gun in with the ship's armory.

According to Captain Barnhart's testimony on the motion to suppress, Lieutenant Commander Peck had advised him "that he had several crew members that revealed they had gotten some light threats and were fearful for their lives. These threats involved a gun, Commander Peck told me he had reason to believe that the gun was in the car." With respect to Peck's "factual basis for stating these things about the threats and about the gun," Barnhart asserted that "one of the sailors that had reported this to him were [sic] under oath and secondly, I specifically questioned him about the reliability of the people he was receiving the information from," and he responded "[t]hat he believed what he was hearing." According to Barnhart, it would not have altered his decision if he had been informed that "the gun had been seen some six weeks before vice two weeks before."

On cross-examination, Barnhart emphasized that he had "grilled ... [Peck] in terms of the reliability of the information he has received." This grilling consisted of asking Peck whether "the people [were] under oath" and whether "he believe[d] them to be reliable." Barnhart, in turn, had relied on "Peck's opinion that the individuals were reliable." Yet he had not been "informed that these individuals were then pending administrative discharge"; that they had received "multiple nonjudicial punishments"; and "that these individuals themselves had been involved in drug transactions." However, Captain Barnhart "knew the drugs were related to the incident as tied to the threats against their lives. I did not know if they were informants or involved in drugs." Commander Peck's main point had been "that their lives had been threatened and he voluntarily told me that it involved the potential use of guns." In response to a question by the defense, Captain Barnhart emphasized that, even if he had known of the bad records of Peck's informants, he "would have to weigh that in the face of the fact that I had a threat against a person's life. It seems to me that's worthwhile going after."

Captain Barnhart had known that Queen was residing on board the USS JOHN YOUNG, which was then at the Naval Station. Moreover, he was aware that Queen "had not checked the gun in with the ship's armory."

Commander Peck did not testify during the suppression hearing. However, the defense called two witnesses. Seaman Recruit Robert Steckinger, who was serving on the USS JOHN YOUNG, had talked to Lieutenant Commander Peck on May 24 about Queen's possession of a pistol. Steckinger told Peck that he had seen the gun at "[s]ome park, off base" on April 12. Steckinger and Queen had been "inside" appellant's car when Queen handed him the pistol. Steckinger had first seen the weapon when "it was being handed to" him by Queen; and he did not know where appellant "got it from." After looking at the gun, Steckinger had given it back; and he "wasn't watching" what Queen did with it then. Steckinger admitted that he had received about 12 nonjudicial punishments; and he testified that Commander Peck knew of his record.

Seaman Recruit Alan McNutt, another defense witness, was a shipmate of appellant; and on May 18 he had talked to Commander Peck about a threat made to him four days earlier. McNutt informed "Peck that ... Queen said he heard I sound like a Narc—a Lark and that they have ways—I quote, 'We have ways of taking care of people who seem like Larks

back home....'" At this point in his testimony, McNutt "held his fist up approximately to the height of the nipple line of his chest and made a noise simulating a gun going off and then raised his fist in the air as if from the recoil of the pistol."

McNutt testified that he was being processed for a discharge and had been offered a better type of discharge if he would tell his Commanding Officer "who was dealing drugs on the ship." At the time, McNutt was facing an other-than-honorable discharge because of having twice tested positive on his urinalysis. He had received five nonjudicial punishments; and Commander Peck was aware of his record. During the interval between the threat on May 14 and the conversation with Commander Peck on May 18, McNutt had been approached by Seaman Glazer who "said that he had heard that Seaman Steckinger, who said he had saw [sic] that Petty Officer Queen had a gun in his car." Subsequently, McNutt "told Commander Peck that Glazer told ... [him] that Steckinger had said that he had seen a gun." McNutt had not said that he had seen a gun; and, indeed, he had not seen one himself.

## II

The first question we must ask is whether the information which Commander Peck provided to Captain Barnhart was sufficient to constitute probable cause. If the test of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), were applied, the answer would probably be in the negative. Even though Peck had told Barnhart that "he believed what he was hearing," this falls somewhat short of the demonstration of reliability on which *Aguilar* insisted, because Barnhart apparently was furnished no information as to why Peck thought his informants were truthful.

However, *Aguilar* has been superseded by *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983), which established a "totality-of-the-circumstances" test. *Cf. United States v. Tipton*, 16 M.J. 283, 286 (C.M.A.1983). Under this test, the determination of probable cause is less mechanical than under *Aguilar*, although reliability and basis of knowledge are still factors to be considered.

Unfortunately, Lieutenant Commander Peck was not called as a witness; and so we lack the benefit of his testimony to clarify what he said to Captain Barnhart. According to Barhart's testimony, Peck told him that one of the sailors had reported to him that the gun "had been seen" in appellant's car; but Peck had not identified the informant. However, the additional circumstances that Peck—who was executive officer of the vessel on which the two informants were stationed and who presumably had frequent contact with them—believed them to be reliable might make up any deficiency in the showing of probable cause.

■ Staleness of the information would be a factor, for, as we recently explained in *United States v. Johnson*, 23 M.J. 209, 212 (C.M.A.1987):

Insofar as the timeliness of the information is concerned, we agree with Judge Carparelli's dissent that it is important to consider the nature of the property which was the subject of the proposed search. If the property sought is a controlled substance, apparently intended for use or distribution, then it probably would not remain in a suspect's possession over a long period of time. Similarly, we do not dispute the conclusion reached in *United States v. Bright*, 2 M.J. 663 (A.F.C.M.R.1976), that a pistol, which "was relatively light in weight, readily portable, concealable, and located in a highly mobile conveyance—an automobile," *id.* at 665, would probably have been moved during the 2 or 3 weeks between the sighting of the pistol and the authorization of the search.

However, under the circumstances of this case, the delay of 2 or even 6 weeks would not be fatal to establishing probable cause. Captain Barnhart stated that he was made aware that Queen did not turn in a pistol to the ship's armory. Appellant would probably have been hesitant to bring a gun

aboard the vessel without turning it in; and so his car might be a logical place to conceal it for several weeks.

■ Finally, even though the gravity of the harm feared has no logical bearing on probable cause, it does seem relevant in determining whether military investigators have complied with the fundamental Fourth-Amendment norm of reasonableness. When a threat of imminent death to a subordinate is involved, a commanding officer who has given a search authorization should be subjected to a less stringent review of his determination of probable cause.[1] Even the most fundamental freedoms are subject to some limitation in order to avert a grave public danger. *Cf. New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). We conclude, therefore, that the recitals of the search authorization appear sufficient to demonstrate probable cause.

### III

■ Although usually a magistrate issuing a search warrant—or, by analogy, a commander issuing a search authorization—may rely on the truthfulness of the statements made to him by an affiant, these statements cannot be considered in determining whether probable cause existed, if later it is demonstrated that the statements were deliberately false or were made with reckless disregard for the truth. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

■ As we understand the contentions of appellate defense counsel, they are claiming that the evidence offered during the suppression hearing establishes that, if Commander Peck told Captain Barnhart that his informant had seen the gun in appellant's car, Peck's statement either was deliberately false or was made with reckless disregard for the truth. Unfortunately, our evaluation of this contention is hampered by the absence from the record of any testimony by Peck.

Consequently, the uncontradicted evidence is that Seaman Recruit Steckinger, who on April 12 had seen the pistol while he was in Queen's automobile, did not talk to Peck until May 24—which was 6 days *after* the search had been authorized. On the other hand, Seaman Recruit McNutt, whose conversation with Peck on May 18 apparently precipitated the request for a search authorization, testified that he had not told Peck that he had seen the pistol, but instead he had reported "that Glazer told" him "that Steckinger had said that he had seen a gun." Obviously, in terms of reliability, a significant difference exists between a report from an informant that he had seen something and a report that the informant heard A say that B said that B had seen the event. *Illinois v. Gates, supra,* makes this distinction relevant.

Perhaps Commander Peck told Captain Barnhart that he had received a thirdhand report that one of the sailors on the YOUNG had seen a gun several weeks before, while he was in Queen's automobile. However, such a report—even if coupled with reliable information that Queen had threatened McNutt—would not constitute probable cause to search appellant's car.

Another possible scenario is that Commander Peck told Captain Barnhart that his confidential informants had reported to

---

1. In this connection, we are reminded of the comments by Justice Jackson, dissenting in *Brinegar v. United States,* 338 U.S 160, 182–83, 69 S.Ct. 1302, 1314, 93 L.Ed.2d 1879 (1949):

   Undoubtedly the automobile presents peculiar problems for enforcement agencies, is frequently a facility for the perpetration of crime and an aid in the escape of criminals. But if we are to make judicial exceptions to the Fourth Amendment for these reasons, it seems to me they should depend somewhat upon the gravity of the offense. If we assume, for example, that a child is kidnaped and the officers throw a roadblock about the neighborhood and search every outgoing car, it would be a drastic and undiscriminating use of the search. The officers might be unable to show probable cause for searching any particular car. However, I should candidly strive hard to sustain such an action, executed fairly and in good faith, because it might be reasonable to subject travelers to that indignity if it was the only way to save a threatened life and detect a vicious crime.

him that Queen had a pistol in his car but that Barnhart simply had not asked for any further details. *Illinois v. Gates, supra,* would not condone such sloppiness in ascertaining facts when a search warrant or authorization has been requested. If this was the only information provided to Captain Barnhart, then—as previously discussed—he had not been given probable cause for authorizing the search, regardless of what was recited in the search authorization.

## IV

The Court of Military Review offered an alternative ground for upholding the military judge's reception of the contested evidence. 20 M.J. at 820. In their view, the "good faith exception" to the exclusionary rule announced in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), was applicable here.

In *Leon,* the defendants had moved to suppress evidence seized by police officers who had obtained a warrant to search several residences and automobiles belonging to defendants. After an evidentiary hearing, the District Court partially granted the motion to suppress because the affidavit used to apply for the search warrant was insufficient to establish probable cause. The Court of Appeals affirmed, but the Supreme Court refused to reach the probable-cause issue. Instead, it crafted an exception to the exclusionary rule by admitting evidence obtained by a police officer who had acted in reasonable reliance on a search warrant issued by a neutral and detached magistrate.

Noting deterrence of police misconduct as the primary purpose of the exclusionary rule, the Court reasoned "that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." The Court also observed that " 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search,' " 468

U.S. at 922, 104 S.Ct. at 3420; and so "the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." *Id.* at 924, 104 S.Ct. at 3421.

The Supreme Court emphasized, however, that, even if there is a search warrant, the evidence seized should still be suppressed when one of these four situations exists:

(1) where the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit (citing *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978));

(2) "where the issuing magistrate wholly abandoned his judicial role" by failing to act in a neutral and detached manner (citing *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979));

(3) where the search warrant was predicated "on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable' " (quoting *Brown v. Illinois,* 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265–66, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)); or

(4) where the search warrant was "so facially deficient" in identifying "the place to be searched or the things to be seized that executing officers cannot reasonably presume it to be valid" (citing *Massachusetts v. Sheppard,* 468 U.S. 981, 988–91, 104 S.Ct. 3424, 3428–30, 82 L.Ed.2d 737 (1984)).

At the time of appellant's trial (1983), Mil.R.Evid. 311(b)(3), Manual for Courts-Martial, United States, 1984, had not yet been promulgated to provide explicitly for the "good-faith exception." Furthermore, in *Leon,* the Supreme Court was discussing good-faith reliance on a search warrant issued by a magistrate; and the result there depended in large part on the rationale that no police misconduct is involved in relying on a facially valid court order.

[5] Even though a military commander may authorize certain searches of persons and property under his command, he is

more analogous to a police officer than to a judge. Consequently, in authorizing searches and seizures, a commander is not subject to some of the requirements imposed on magistrates—such as the requirement that probable cause be established under oath, *United States v. Stuckey*, 10 M.J. 347 (C.M.A.1981)—and, conversely, it should not be automatically assumed that the "good faith exception" for search warrants applies to a commander's authorization of a search.

Even if this exception would otherwise apply, it is unavailable when the authorization for search was issued by a commander in reliance on a deliberately or recklessly false affidavit. *United States v. Leon, supra*. In this regard, the issue is the same as that posed under *Franks v. Delaware, supra*—which holds that such statements may not be considered in determining whether a magistrate had probable cause for issuing a warrant. Thus, regardless of the "good-faith exception," we must still confront the question of what did Commander Peck know and when did he know it. As has already been noted, the uncontradicted evidence offered at the suppression hearing tended to show that Peck lacked a factual basis for his report to Captain Barnhart. Such an inference is strengthened by Peck's failure to advise Captain Barnhart of the prior criminal records and possible bias of the "confidential informants."

We prefer, however, not to decide the case on inferences from a skimpy record, when remand to the trial court for receipt of testimony from Commander Peck offers a means to clarify the ambiguities in the record.[2] Thus, a *DuBay*[3] hearing now seems appropriate in order to permit a more informed determination as to whether

Commander Peck's report to Captain Barnhart was intentionally false or made with reckless disregard for the truth.

## V

The decision of the United States Navy-Marine Corps Court of Military Review is set aside; and the record of trial is returned to the Judge Advocate General of the Navy for submission to a convening authority, who may order a *DuBay* hearing for the receipt of further evidence concerning the legality of the search and seizure. At the conclusion of such a hearing, the record will be returned directly to this Court. If such a hearing is deemed impracticable, the convening authority may dismiss the affected charges and reassess the sentence based on the offenses of usury and distribution of marijuana. In such a situation, Article 66, UCMJ, 10 U.S.C. § 866, will apply.

Judge SULLIVAN concurs in the result.

COX, Judge (dissenting):

As I read the record, Captain Barnhart's authorization to search appellant's vehicle was based on full probable cause. Lieutenant Commander Peck's recitation to the Captain satisfied both the reliability and the basis-of-knowledge aspects of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). What we observed in *United States v. Tipton*, 16 M.J. 283, 287 (C.M.A.1983), bears repeating:

> We have previously recognized the unique "truth-telling effect" of an identified servicemember's giving information in the presence of a superior officer.

**2.** Although remand to the trial court should not become a means for allowing the Government to cure its failure during a suppression hearing to prove that a search and seizure were reasonable, we believe that, when the record is unclear—as in this case—the Government should be allowed to offer testimony to counter inferences that an affiant's statements to the commander who authorized the search were made falsely or with reckless disregard for the truth.

*Cf. United States v. Radlick*, 581 F.2d 225, 228–29 (9th Cir.1978); *United States v. Seay*, 432 F.2d 395, 402 (5th Cir.1970), *cert. denied*, 401 U.S. 942, 91 S.Ct. 949, 28 L.Ed.2d 223 (1971); *Masiello v. United States*, 304 F.2d 399, 401 (D.C.Cir.1962); *Costello v. United States*, 298 F.2d 99, 102 (9th Cir.1962).

**3.** *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967).

*United States v. Land,* 10 M.J. 103, 105, 107 (C.M.A.1980). This same salutary effect is present when the authority is a military police officer. *United States v. Harris,* ... 403 U.S. [573] at 593, 91 S.Ct. [2075] at 2086 [29 L.Ed.2d 723 (1971)] (Harlan, J., dissenting); *United States v. Davis,* 617 F.2d 677, 693 (D.C.Cir.1979). Simply put, there is a degree of accountability in a military environment that is unparalleled in civilian society. *United States v. Schneider,* 14 M.J. 189, 192–93 (C.M.A.1982); *United States v. Davenport,* 9 M.J. 364 (C.M.A.1980); *see Schlesinger v. Councilman,* 420 U.S. 738, 757, 95 S.Ct. 1300, 1312, 43 L.Ed.2d 591 (1975). Thus, taking a "common-sense" approach to probable cause, we find in the totality of the circumstances that ... [the informant's] "accountability" was sufficient to overcome his lack of proven reliability.

The accountability here of the crew-member informants to their Executive Officer, Lieutenant Commander Peck, was equally manifest, and their source of knowledge was specifically alleged to be personal observation. Thus I agree with the lead opinion to the extent it concludes "that the recitals of the search authorization appear sufficient to demonstrate probable cause." Lead op. at 140.

My point of departure with the lead opinion is the implicit conclusion that appellant has sustained his burden of mak[ing] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit....

*Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978).

As I understand the facts, the defense presented a witness who testified that he told Lieutenant Commander Peck that appellant had threatened to shoot him, but he had not seen a gun. In fact, the witness only heard about the gun from another servicemember. The defense presented another witness who saw the gun, but claimed to have reported that fact to Lieutenant Commander Peck only *after* it already had been seized. With respect to the latter witness, two conclusions are possible. If his testimony was accurate, he obviously was not one of the people on whom Lieutenant Commander Peck relied. Otherwise, the witness' dates were off. It is not apparent, in any event, why the witness would have been volunteering this information to Lieutenant Commander Peck 6 days after the gun had been seized. In sum, the defense has found two witnesses who arguably did not supply Lieutenant Commander Peck with the necessary information.

It is surprising, actually, that only two such witnesses could be found. I would have thought they could have found many more people who did not supply Lieutenant Commander Peck with probable-cause information. There is, after all, no claim that these were the sources on which the officer was relying. Thus, the fact that defense counsel was able to find these witnesses hardly taints the "warrant." Indeed, notwithstanding the majority's conclusion that the Government was somehow remiss in not securing Lieutenant Commander Peck's testimony, lead op. at n.2, it is pretty obvious that the defense also was remiss in not calling the officer to testify, since the "warrant" was facially valid.

Thus this record does not support the claim that "the uncontradicted evidence offered at the suppression hearing tended to show that Peck lacked a factual basis for his report to Captain Barnhart." Lead op. at 142. Actually, the uncontradicted defense evidence showed nothing at all relevant. What is uncontradicted is that Lieutenant Commander Peck conveyed sufficient information to Captain Barnhart to support the latter's reasonable belief that a weapon would be found in appellant's vehicle. Ironically enough, the weapon was exactly where Lieutenant Commander Peck said it would be.

\*     \*     \*

It has now been 5 years since Lieutenant Commander Peck approached Captain Barnhart bearing the information given him by his crew members. I do not know

if he is even alive, much less still in the Navy. If he is still in the Navy, I can only imagine how many seas he will have steered ships through in that interval and how many intense duties and responsibilities he will have borne, not to mention the mountains of "people problems" he will have encountered. If he can now remember even the names of those informants, much less *exactly* what they told him and when, he is a better man than I. Yet, in the posture the majority leaves this appeal, the case rises or falls on Lieutenant Commander Peck's ability to recollect just that.

Contrary to the majority's assertion, this remand is not "a means for allowing the Government to cure its failure" (lead op. at n. 2), for the Government did not fail. This remand is not even an opportunity for the defense to cure *its* failure. It is—simply stated—the employment of a circuitous route to reverse appellant's conviction. I disagree with this method and dissent.