### UNITED STATES

v.

### Staff Sergeant Frank J. LOPEZ, FR 546–17–6910, United States Air Force.

### ACM 28069.

U.S. Air Force Court of Military Review.

Sentence Adjudged 13 Sept. 1989.

Decided 23 April 1991.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Major Ronald G. Morgan.

Appellate Counsel for the U.S.: Colonel Joe R. Lamport, Colonel Robert E. Giovagnoni, Lieutenant Colonel Brenda J. Hollis, Major Terry M. Petrie, Captain Brian C. Newby, and Captain Thomas E. Wand.

Before O'BRIEN, PRATT and RIVES, Appellate Military Judges.

## OPINION OF THE COURT

RIVES, Judge:

Staff Sergeant Frank Lopez' commander suspected him of an offense; he guessed that evidence of the crime may be in Lopez' dormitory room. The commander's suspicions did not rise to the level of a probable cause basis to believe the evidence would be in the room. Nonetheless, under cover of the commander's search authorization, Lopez' room was searched and evidence was seized. Facing the issue of whether the "good faith" exception to the exclusionary rule will validate the search and permit the evidence to be admitted, we hold that it does not.

Lopez was tried by a general court-martial composed of officers at Torrejon Air Base, Spain. Charged with possession and use of too many ration cards and with the theft of three ration cards (in violation of Articles 92 and 121, UCMJ, 10 U.S.C. §§ 892, 951), Lopez moved to suppress the cards because they had been illegally obtained. When his suppression motion was denied, he entered conditional pleas of guilty to all charges and specifications. His approved sentence extends to a bad conduct discharge and reduction to airman basic.

## I

### Factual Background

Lopez served as the noncommissioned officer in charge of his unit orderly room, the 401st Aircraft Generation Squadron (AGS). His responsibilities included issuing ration cards to members of his squadron. The ration cards enabled authorized patrons to purchase items, in limited quantities, at the various tax-exempt shops run by the U.S. military in Europe.

On 4 April 1989, the Air Force Office of Special Investigations (OSI) at Torrejon received a complaint that Lopez may have been abusing his ration card privileges. After OSI apparently took no action on the report, the complaint was forwarded to the security police on 10 May 1989. The security police investigated the allegation and then briefed Major Harrison, the 401 AGS commander, on 11 May 1989. The information from the security police was not provided to Harrison in writing or under oath.

Harrison was told that Lopez had come to the attention of a cashier at the commissary because he made purchases through her line on an unusually frequent basis. Also, she noticed that he had signed his own ration card as the certifying official. The governing regulation does not preclude Lopez from certifying his own ration card. The cashier believed that Lopez was using more than one ration card. A second commissary cashier also told the investigators that she believed Lopez was using more than one ration card.

Harrison coupled this information with his knowledge that Lopez had access to the squadron's ration cards and with his belief that Lopez had recently had financial problems. After consulting with the base staff judge advocate, Harrison orally authorized a search of Lopez' person, office desk, automobile, and dormitory room on base.

Lopez was called from the nearby orderly room to Harrison's office. After being told that his commander had authorized the search, Lopez said: "Okay," and then he cooperated with the investigators in their search. The investigators found one ration card in Lopez' wallet and three other cards in his dormitory room. After the search, the authorization was reduced to writing.

Before authorizing the search, Harrison was not told that Lopez' suspicious conduct had been reported to OSI in early April and that the cashiers had simply told the security police about the observations they had made some five weeks before and earlier. He was not given the names of the cashiers or provided any other information about them, and the cashiers did not provide written statements.

### Findings of the Military Judge

Trial defense counsel moved to suppress the three ration cards which were seized from Lopez' dormitory room. After consid-

ering evidence on the motion, the military judge ruled that the seizures were "not sustainable either as consent or probable cause, but that the search and seizure of the ration cards is sustainable applying the good faith exception" of Mil.R.Evid. 311(b)(3)(C). The judge then provided essential findings on the evidentiary matters. Mil.R.Evid. 311(d)(4); R.C.M. 905(d).

■ Although the trial counsel argued that Lopez had consented to the search, the military judge found that the government had not established consent by clear and convincing evidence. Mil.R.Evid. 314(e)(5). When first confronted by the investigators, Lopez was told that his commander had already authorized the search. He was not formally or specifically asked to consent to the search. We agree that Lopez' cooperation in the search merely amounted to acquiescence or submission to authority. *See United States v. Middleton,* 10 M.J. 123, 132–33 (C.M.A.1981); Mil.R.Evid. 314(e)(4).

■ The military judge also decided the evidence was insufficient "to show by a preponderance of the evidence that the search authorization was based on probable cause." Harrison had been told of suspicions by two commissary cashiers that Lopez seemed to be making excessive purchases and that he may have been using more than one ration card. He was told that one cashier questioned Lopez' right to sign his own card as certifying official. However, he was not informed when the suspicious activity had occurred, nor was he told of the last time that Lopez had used a suspected fraudulent card. The judge found that "no information was presented concerning the identity or the reliability of the complaining cashiers nor were their allegations corroborated in any way." He concluded that it was not reasonable to assume that Lopez had the cards in his dormitory room on the date the search authorization was given, "considering the unknown or unexpressed period of time since [Lopez had] last used a suspect card in the commissary." We agree that this search cannot be sustained on probable cause grounds.

Completing his essential findings, the military judge determined that the ration cards were admissible under the "good faith" exception to the exclusionary rule. He found that the investigators had acted reasonably in bringing the facts as they knew them to the attention of Harrison in order to seek a search authorization. He decided that Harrison "acted in a neutral and detached manner in analyzing the information presented to him, including seeking the legal advice of the staff judge advocate." The judge ruled that both Harrison and the investigators acted in a reasonable and responsible manner, and that the search authorization had sufficient "indicia of probable cause" to support admission of the ration cards under the good faith exception. Accordingly, he decided that Mil.R.Evid. 311(b)(3)(C) "applies in this case and the good faith exception does apply to a commander."

We do not agree that the good faith exception applies to this commander under the facts of this case.

## II

The Fourth Amendment contains powerful language, offering guarantees against "unreasonable searches and seizures." However, like a steel gate that has no lock, its protections become illusory without an enforcement mechanism. The exclusionary rule is the judicially created remedy to protect an accused against an illegal search and seizure. Long ago, the Supreme Court observed that without an exclusionary rule "the 4th Amendment ... is of no value, and ... might as well be stricken from the Constitution." *Weeks v. United States,* 232 U.S. 383, 393, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914).

The primary purpose of the exclusionary rule is to deter illegal police conduct. *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); 1 W. LaFave, *Search and Seizure,* § 1.1(f) at 16–20 (2d ed. 1987). Evidence that is otherwise competent and reliable becomes inadmissible when it is improperly seized. By denying the admission of illegally seized evidence, the suppression doctrine compels

"respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960).

The rationale of the exclusionary rule is appealing. It restores the status quo, placing the government in the same position it would have been had no illegal search and seizure occurred. What better way to deter official misconduct than to suppress evidence that is acquired by unconstitutional means?

The rule has been widely assailed, however, as a draconian remedy that is not always necessary. Cardozo provided the classic attack: "The criminal is to go free because the constable has blundered." *People v. Defore,* 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926), *cert. den.,* 270 U.S. 657, 46 S.Ct. 353, 70 L.Ed. 784 (1926). Ultimately, exceptions have been adopted to preclude unwarranted mechanical application of the exclusionary rule.

The Supreme Court established the "good faith" exception to the exclusionary rule in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In that case, police officers had obtained a warrant to search for drugs based on an informant's tip. Although the warrant seemed valid on its face, it was later found defective for lack of probable cause. Lower courts held the evidence to be inadmissible under the exclusionary rule. The Supreme Court disagreed, deciding that "the officers' reliance on the magistrate's determination of probable cause was objectively reasonable, and application of the extreme sanction of exclusion is inappropriate." *Id.* at 926, 104 S.Ct. at 3422. The underlying premise of *Leon* is that the exclusionary rule is designed to deter police misconduct, and that purpose is not advanced when the police act in good faith reliance on a judicial officer's determination of probable cause.

### III

The Supreme Court recognizes the military as "a specialized society separate from civilian society." *Parker v. Levy,* 417 U.S.

733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974); *see also United States v. Kalscheuer,* 11 M.J. 373, 376 (C.M.A.1981). Some accommodations have been permitted in adapting constitutional protections to the military. *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953); *United States v. Jacoby,* 11 U.S.C.M.A. 428, 29 C.M.R. 244 (1960).

In the civilian context, the focus of the Fourth Amendment is on the warrant requirement. Search warrants must be in writing, under oath, and issued by a magistrate. Warrants are not required in the military; the focus here is on the reasonableness of a search. Search authorizations may be oral, need not be under oath, and may be authorized by a commander. *United States v. Stuckey,* 10 M.J. 347 (C.M.A.1981). Absent an exception, the requirement to base a search on probable cause remains. *See, e.g., New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); *United States v. Morris,* 28 M.J. 8, 15 (C.M.A.1989).

While critics deride the exclusionary rule as a judge-made rule not mandated by the constitution, probable cause is the constitutionally-imposed standard for searches. Justice Traynor observed that the criminal does not go free because the constable blundered, but because the Constitution prohibits "securing the evidence against him." *People v. Cahan,* 282 P.2d 905, 914 (1955). The criminal would also go free if the evidence had not been illegally seized in the first place.

Here, Major Harrison was not presented with sufficient information to lawfully authorize the search of Lopez' dormitory room. He acted on mere suspicion. *See United States v. Brown,* 10 U.S.C.M.A. 482, 489, 28 C.M.R. 48, 55 (1959). Quite simply, he authorized a search of every area that was under Lopez' control: his person, his office desk, his automobile, and his dormitory room. Harrison was not told that the information from the cashiers was at least five weeks old, nor was he told when Lopez had last used a suspected fraudulent card. He was provided no information on the identity or reliability of

the cashiers, nor was their information under oath. While not dispositive, these factors are relevant to the "totality of the circumstances" probable cause determination. *See Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Queen,* 26 M.J. 136, 139 (C.M.A.1988); *United States v. Tipton,* 16 M.J. 283 (C.M.A.1983). The military judge correctly decided that probable cause was lacking. We next address the larger issue—whether the good faith exception should be applied to searches authorized by commanders.

### IV

The applicability of *Leon* to searches authorized by commanders has been discussed but not resolved. In *United States v. Morris, supra,* each judge on the Court of Military Appeals wrote separately. Chief Judge Everett would apply the good faith exception only to those searches authorized by military judges or military magistrates; Judge Cox would review the reasonableness of a commander's acts, without considering application of the good faith exception; finally, Judge Sullivan would simply adopt the good faith exception of *Leon* and Mil.R.Evid. 311(b)(3)(C). 28 M.J. at 12, 14, and 19. *See also United States v. Brothers,* 30 M.J. 289, 293 (C.M.A.1990); *United States v. Queen, supra; United States v. Postle,* 20 M.J. 632 (N.M. C.M.R.1985).

The Supreme Court has observed that the "scope of the Court's good-faith exception is unclear." *Illinois v. Krull,* 480 U.S. 340, 366, 107 S.Ct. 1160, 1176, 94 L.Ed.2d 364 (1987) (O'Connor, J., dissenting). One point that was clear in *Leon,* however, is that the exclusionary rule was designed to deter the police, not the magistrate who authorizes a search. The Court had no real concern that judicial officers would use the good faith exception to authorize unconstitutional searches. "Judges and magistrates are not adjuncts of the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions." *Leon,* 468 U.S. at 917, 104 S.Ct. at 3417. What is true for judicial officers, however, does not necessarily apply to commanders. *See United States v. Johnson,* 21 M.J. 553, 557, n. 2 (A.F.C.M.R.1985); *rev'd on other grounds,* 23 M.J. 209 (C.M.A.1987).

The Manual for Courts–Martial provides that searches can be authorized by *"an impartial individual* in the following categories:" a commander of the person or place to be searched, a military judge, or a military magistrate. Mil.R.Evid. 315(d) (emphasis added). Distinctions have been made in deciding how much deference to give the search authorizing official. This Court recently noted that "a commander's decision to search is subject to closer scrutiny than those of a military judge or magistrate." *United States v. Sloan,* 30 M.J. 741, 746 (A.F.C.M.R.1990).

The good faith exception is predicated on the assumption that a search authorization will come from a disinterested judicial officer. *See McCommon v. Mississippi,* 474 U.S. 984, 106 S.Ct. 393, 88 L.Ed.2d 345 (1985) (*cert. denied*) (Brennan, J., dissenting). By the very nature of their positions and responsibilities, commanders simply do not possess the qualities of disinterested judicial officers. It is not a criticism to note that commanders will always have a stake in the outcome of criminal investigations within their command. When supported by probable cause, the ability of commanders to authorize searches does comport with "the Fourth Amendment's basic norm of reasonableness." *Stuckey, supra,* 10 M.J. at 361. Commanders have the power to search because of their unique responsibilities for the people and property under their command. *Kalscheuer, supra,* 11 M.J. at 376.

The judicial powers of commanders may conflict with their law enforcement responsibilities; certainly, there is a tension between the two. The same commander who determines probable cause must also maintain discipline, investigate crime, enforce the law, and authorize prosecutions. *See United States v. Ezell,* 6 M.J. 307, 317, 318 (C.M.A.1979). The conflicting judicial and prosecutorial roles "create a palpable possibility that commanders, influenced by their

law enforcement role, will perceive probable cause where none exists or that, in determining the constitutional reasonableness of a search, they will give insufficient weight to legitimate privacy interests." Vienna and Chema, *United States v. Leon: Good Faith and the Military Commander*, 25 A.F.L.Rev. 95, 103 (1985).

█ Fourth Amendment requirements are satisfied when the commander can impartially determine probable cause. They are violated when the commander merely serves as another member of the team engaged in the "often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

Our concern rises when a commander authorizes a search in violation of an accused's Fourth Amendment rights. Broadly applying the good faith exception to commanders would be tantamount to eliminating the exclusionary rule. This in turn would reduce the motivation for commanders to find probable cause before authorizing a search. It would also "encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests." *Leon*, 468 U.S. at 917, 104 S.Ct. at 3418. *See generally* Fountain, *The "Good Faith" Exception to the Commanders' Search Authorization: An Unwarranted Exception to a Warrantless Search*, The Army Lawyer, August 1988, at 29, 32.

The rule of *Leon* must be limited to appropriate cases, or the good faith *exception* will swallow the exclusionary *rule*. Commanders are complementary members of the law enforcement team. They do have stakes in the outcome of prosecutions. Some commanders would find little motivation to ever bother with the constitutional requirement of probable cause if a search could be authorized without it and the seized evidence would later be validated and admitted under the good faith exception. The Fourth Amendment may be ignored with impunity unless a penalty will result from a commander's failure to impartially consider the issue of probable cause.

Commander's search authorizations will be reviewed with great care. *See* MCM, App. 22, Mil.R.Evid. 311(b)(3) (1984). Doing so here, we note that as a unit commander, Major Harrison represents the lowest level of command. We have no evidence that he had even the most rudimentary Fourth Amendment training. Most compelling, he was not "neutral and detached" as to this investigation. His orderly room NCOIC, whose responsibilities included issuing ration cards, was suspected of abusing the ration control system. The commander had a clear, direct interest in this investigation and in the outcome of the search. Ultimately, he preferred the court-martial charges against Lopez. When he demonstrates personal "involvement in the investigative or prosecutorial process against the accused, the commander is devoid of neutrality and cannot validly perform the functions" of a search-authorizing official. *Ezell, supra*, 6 M.J. at 318–319.

Our decision today is not a *per se* prohibition against applying the good faith exception to searches authorized by commanders. Had this search authorization come from the installation commander, and had that officer been neutral and detached as to this investigation, the good faith exception may well permit the evidence to be admitted. Certainly, had the search been authorized by a military judge or military magistrate, we would apply the good faith exception. *See* Air Force Regulation 111–1, *Military Justice Guide*, paragraph 1–8, Change 3 (9 March 1990).

█ While *Leon* was adopted for military practice in Mil.R.Evid. 311(b)(3), we are not satisfied that it can be transposed to include every commander. *See Krull, supra*, 480 U.S. at 360, n. 17, 107 S.Ct. at 1172–73 n. 17. Unlike judicial officers, commanders are not presumed to be neutral and detached. *Stuckey, supra*, 10 M.J. at 361. Except for those cases when the government can show the requisite level of detachment by a particular commander, we hold that the prosecution cannot benefit from the good faith exception to the exclu-

sionary rule. *See United States v. Shar-rock,* 30 M.J. 1003, 1007 (A.F.C.M.R.1990).

■ In this case, the existence of probable cause is very tenuous. To admit the evidence under *Leon* would eviscerate the Fourth Amendment safeguards. No apparent limits would bind the commander or protect the servicemember. Here, a commander with an obvious interest in the investigation authorized a search without the probable cause basis to support that invasion of the appellant's privacy. We draw the line at such an extension of the good faith exception. *See generally* Stevens, *Examining the "Good Faith" Exception to the Exclusionary Rule and Its Application to Commanders' Search Authorizations,* The Army Lawyer, June 1986, at 55.

■ The good faith exception will be available only when the initial probable cause determination is made by a neutral and detached individual. In civilian life, that person would be a judicial officer. Searches authorized by military judges and military magistrates will normally benefit from the good faith exception. Searches authorized by commanders are not entitled to the same deference; the government must meet a difficult burden to show that a commander has the requisite degree of impartiality.

The good faith exception does not apply in this case.

Since the findings of guilty were all predicated on the fruits of an illegal search, a rehearing is not appropriate. The findings of guilty and the sentence are set aside, and the charges are

DISMISSED.

PRATT, Senior Judge (concurring in the result):

I concur with Judge Rives' conclusions that the search in this case was not adequately founded on probable cause and that the "good faith" exception to the exclusionary rule should not apply under the facts of this case.

I write separately to express my concern and belief that, in reaching his conclusion

on the application of the "good faith" exception in this case, Judge Rives did not go quite far enough. I need not write at great length to express myself on this issue, because my position is not a novel one. I agree in full with the position and analysis of Chief Judge Everett in his lead opinion in *United States v. Morris,* 28 M.J. 8 (C.M. A.1989), wherein he appropriately concluded:

> ... unless and until the Supreme Court expands the rationale of *Leon,* the good-faith exception should only be applied in courts-martial where law enforcement personnel have reasonably relied on warrants or authorizations issued by military judges or military magistrates.

*Id.* at 12. In my view, a commander, by the very nature of his position and responsibilities, does not and cannot fit a profile consistent with the delicate rationale on which the "good faith" exception hinges. This belief in no way denigrates the position of "commander;" if anything, it more fully credits the broad range of duties and responsibilities inherent in the position. The fact remains that, in the context of the "good faith" exception, a commander is simply not in the same "kettle of fish" as a military magistrate or a military judge.

O'BRIEN, Chief Judge (dissenting):

The majority finds that the military judge was right when he found no probable cause for the search and wrong when he allowed appellant's contraband ration cards into evidence by applying the good faith exception to the exclusionary rule (Mil.R. Evid. 311(b)(3)(C)). I disagree and dissent.

The probable cause question is a close one, and I fully acknowledge that the judge's decision on that issue is quite supportable. Although I believe the judge was wrong, had that problem been standing alone, I might very well have deferred to him and to the majority and concurred. The majority's refusal to apply the good faith exception, however, impels me to register my disagreement. The very closeness of the question, in my opinion, supports application of the good faith exception.

## I PROBABLE CAUSE

Cashiers at the Torrejon Air Base commissary told a security policeman by the name of Sergeant Stewart on 4 April 1989, that Sergeant Lopez was buying numerous cartons of cigarettes several times per week, and that he was using different cards, and that some of them had been issued and signed by Sergeant Lopez. This information found its way to Sergeant McKinnon a security police investigator, who interviewed the cashiers and then presented the information to appellant's commander, Major Harrison, and asked him for a search authority, the military equivalent to a warrant.

Major Harrison added this intelligence to his own knowledge that Lopez had been in financial difficulty, and that his job in the orderly room was to issue ration cards. After consulting his chief legal advisor, the base staff judge advocate, who advised him that probable cause existed, the commander thereupon issued the requested authority. The investigators secured Lopez's "consent," then, armed with both the commander's authorization and the consent, they proceeded to search and find the contraband, the extra ration cards.

The military judge correctly decided that Lopez's agreement to this procedure was more acquiescence than consent. However, he concluded further that the information presented to the commander was insufficient to constitute probable cause. The majority's agreement with this decision is the first part of my dissent.

The military judge's ruling that probable cause did not exist was a legal conclusion, not a factual determination. *United States v. Wood*, 25 M.J. 46 (C.M.A.1987). In reaching this result, the judge misapplied the law. Initially I note that in his questioning, and explicitly in his findings, the judge made much of the failure of the police to convey any information to the commander concerning the names or "reliability" of the two cashiers who had complained about Lopez's lavish use of a number of ration cards. While reliability remains a factor to be considered, it was not in issue here and it appears that the judge

was putting the cashiers into the category of underworld informants rather than "a concerned citizen reporting an illegal act to a policeman." *United States v. Wood, supra; United States v. Watford*, 14 M.J. 719 (A.F.C.M.R.1982); *United States v. Ozanich*, 27 M.J. 585 (A.F.C.M.R.1988).

The military judge found that the security police investigator, "Tech Sergeant McKinnon, said that this activity by the accused had been going on for a long period of time, but did not state how many times, any general or specific time period, and did not, more significantly, indicate when the last time was that the accused allegedly used a suspected bogus card."

Sergeant McKinnon had transferred to Florida and did not testify in the trial. (There was a short stipulation of his testimony which related to the issue of consent, and the chronology of the complaint and investigation.) The only person who gave testimony in this trial concerning what the commander was told by McKinnon was the commander. This same commander testified explicitly that he had been briefed that Lopez's unlawful activity was still going on.

If the military judge was making a finding that the evidence of appellant's wrongdoing was too "stale" to constitute probable cause, I have to disagree. Even if a few weeks had gone by since the last hard evidence of unlawful ration card activity, there is no dispute that Lopez's enterprise had gone on for a long period of time. The law is clear that evidence of a continuing enterprise such as this will support a finding of probable cause for a longer period of time than a single instance of misconduct.

> "Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant."

*United States v. Johnson*, 461 F.2d 285 (10th Cir.1972); 2 LaFave Search and Seizure, § 3.7(a) (2d ed. 1987).

In short, two cashiers observed Lopez using several ration cards, some issued by himself, to buy an unreasonable amount of cigarettes over a long period of time. This information was conveyed to Lopez's commander who put it together with his own knowledge that Lopez had been in financial difficulty, and that his job gave him access to ration cards. Whatever the period of time between the complaint and the briefing to the commander, it was in my opinion sufficiently recent to warrant the commander's conclusion that the instrumentalities of the crime, the ration cards, would still be in Lopez's possession.

Finally, it was reasonable to search for the cards in the barracks room where Lopez lived. "Using the 'totality-of-the-circumstances analysis' authorized by *Illinois v. Gates*, 462 U.S. 213, 233, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983) ... [I] am satisfied that the evidence made available to the commander who authorized the search was sufficient to constitute probable cause...." *United States v. Johnson*, 23 M.J. 209 (C.M.A.1987).

## II  THE GOOD FAITH EXCEPTION

If I had agreed with the judge that the search lacked probable cause, I would agree with him also in allowing the evidence discovered during the search into evidence (denying a defense motion to suppress). If probable cause had fallen short, this would be the perfect case to apply the "good faith exception" to the exclusionary rule embodied in Mil.R.Evid. 311. This exception provides:

> (3) Evidence that was obtained as a result of an unlawful search or seizure may be used if:

> · · · · ·

> (C) The officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant. Good faith shall be determined on an objective standard.

Mil.R.Evid. 311(b)(3)(C).

Finding that the commander had "a clear, direct interest in this investigation and in the outcome of the search," the majority finds Major Harrison was not sufficiently "neutral and detached" to allow application of the exception. They also pile onto the scale other factors relating to the commander, such as the level of his command (unit commander, "the lowest level of command"), and the absence from the record of any reflection of formal "Fourth Amendment training." I would note initially that if the commander lacks neutrality and detachment, he is disqualified from issuing a search authority in the first place, and we do not even get to the question of any exceptions, "good faith" or otherwise. *United States v. Ezell*, 6 M.J. 307 (C.M.A. 1979).

As the majority points out, the Supreme Court gaveth the exclusionary rule to deter police misconduct. *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). It now taketh away the rule in cases where there is no police misconduct, and all are operating in good faith. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The President has blessed application of the rule to military law. Mil.R.Evid. 311(b)(3)(C). Although there is as yet a dearth of military case law dealing with application of the good faith exception to searches under military law, it would appear that the Court of Military Appeals would include search authorizations issued by commanders within the scope of this rule. *See United States v. Morris*, 28 M.J. 8, 19 (C.M.A.1989), (Sullivan, J., concurring in part and in the result), *United States v. Brothers*, 30 M.J. 289, 293 (C.M.A.1990).

It seems that the majority's hesitation to allow Staff Sergeant Lopez to suffer the legal consequences of his unlawful activity is founded upon subjective concerns that the good faith exception would "swallow" the exclusionary rule if applied in cases such as this. *Significantly, however, their opinion does not contradict the judge's finding that both the police and the commander were operating in good faith.*

The majority is concerned that the commander was not told precisely when the last time Lopez was seen using a bogus card, and, that he authorized a search of all areas under appellant's control. I believe the commander was provided sufficient information. If there was any doubt, what should a reasonable commander have done under these circumstances? He should do exactly what Major Harrison did here. He checked with his "general counsel," the staff judge advocate, who told him that he had probable cause and to go ahead. It is difficult to conceive of a case where good faith more palpably exists.

The answer to the majority's concerns about the continued viability of the exclusionary rule after application of the "good faith exception," can be found both within *Leon,* and the rule itself. The Supreme Court makes it clear that if either the police or the magistrate do not have a substantial basis for their actions, the exception will not be applied. It is incumbent upon the prosecution to establish "good faith." This they have done. I would affirm.